# Exhibit 2

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

FREDERICK C. BENSON *et al*.,

Plaintiffs,

v.

ISLAMIC REPUBLIC OF IRAN and JOHN DOE WALLET HOLDERS 1-814,

Defendants,

v.

TETHER INTERNATIONAL, S.A. de C.V. & CIRCLE INTERNET FINANCIAL, LLC.

Garnishees.

Case No. ______________

**DECLARATION OF ADAM ZARAZINSKI**
**IN SUPPORT OF PLAINTIFFS' EMERGENCY MOTION FOR WRIT OF ATTACHMENT**

I, Adam Zarazinski, declare pursuant to 28 U.S.C. § 1746 and subject to the penalty of perjury, that the following is true and correct:

**BACKGROUND**

1. I am the Chief Executive Officer of Inca Digital, Inc. ("Inca Digital"), an intelligence company that provides data, analytics, and subject-matter expertise to many of the world's leading cryptocurrency exchanges, financial institutions, regulators, and government agencies. Inca Digital develops data-driven intelligence and analytics on digital asset markets, combining blockchain data, market activity, and open-source information to produce actionable insights on the structure, behavior, and risks of the crypto ecosystem. The company's work focuses on market intelligence, risk identification, and the detection of illicit or high-risk activity, supporting financial institutions, government agencies, including the Department of Defense, and other stakeholders in understanding how digital assets are used across both legitimate and non-traditional financial systems. I oversee multidisciplinary teams of engineers, analysts, and security professionals—many of whom possess military, intelligence, or national security backgrounds—who develop analytic tools and conduct intelligence relating to digital asset markets. These teams apply advanced data analytics, blockchain transaction analysis, and intelligence methodologies to surveil financial markets, identify illicit finance and fraud, support law-enforcement investigations, and provide strategic intelligence to financial institutions and policymakers operating in the digital asset sector.

2. As Chief Executive Officer, I am responsible for the strategic direction of the company and for supervising research and analytic work relating to cryptocurrency markets, blockchain transactions, and emerging financial technologies. Inca Digital's technology and analytical frameworks are used by financial institutions, trading firms, regulators, and law-enforcement agencies to understand risks associated with digital asset markets and to detect

criminal activity such as fraud, market manipulation, and sanctions evasion. The company has developed proprietary analytic systems that aggregate data from blockchain ledgers, exchanges, dark web forums, and other sources to identify patterns of behavior and financial flows across the digital asset ecosystem. Through this work, Inca Digital assists both private and public sector entities in understanding how digital assets function within the global financial system and how they may be used in both legitimate commerce and illicit activity.

3. A true and correct copy of my resume is attached hereto as **Exhibit 1**.

4. I also serve as a Judge Advocate in the United States Air Force Reserve, a position I have held since 2019. I initially entered active-duty service in the United States Air Force in 2014 as a Judge Advocate. In this capacity, I have provided legal support to military operations and national security missions and advised commanders on matters involving operational law, intelligence activities, and the law of armed conflict. While on active duty, I served as Chief of Operations Law and as a prosecutor at Joint Base Andrews, where I advised military leadership on operational and intelligence matters and represented the United States Air Force in courts-martial and other military justice proceedings. I also served as a NATO Attorney-Advisor in Kabul, Afghanistan, where I advised coalition personnel on intelligence operations.

5. Following my active-duty service, I transitioned to the United States Air Force Reserve in 2019, where I continue to serve as a Judge Advocate while also working in the private sector in the field of financial intelligence and digital asset analytics.

6. I hold a Juris Doctor from the University of Michigan Law School, a Master of Arts in Human Rights and International Relations from the University of Nottingham, and a Bachelor of Arts in Political Science from DePaul University.

7. I have provided expert analysis and testimony in a range of matters involving cryptocurrency, blockchain tracing, sanctions exposure, illicit finance, and digital asset valuation. My public testimony has included appearance before the United States House Financial Services Committee, Subcommittee on National Security, Illicit Finance, and International Financial Institutions, at a hearing entitled *How America and Its Allies Can Stop Hamas, Hezbollah, and Iran from Evading Sanctions and Financing Terror*, where I testified regarding the use of cryptocurrency by terrorist organizations and sanctioned actors, including the role of blockchain analytics and open-source intelligence in identifying fundraising campaigns, tracing wallet activity, and understanding how actors tied to Hamas, Hezbollah, and Iran exploit digital asset infrastructure. In that testimony, I explained that cryptocurrency is only one part of a broader illicit-finance ecosystem, but that it provides investigators with unique opportunities to trace flows, identify counterparties, and support interdiction when combined with other intelligence sources.

8. My expert work has also extended to judicial proceedings involving digital asset valuation and blockchain-related loss analysis. For example, in the Bittrex bankruptcy litigation, I was accepted as an expert and provided opinion testimony regarding the historical valuation of cryptocurrencies associated with the claimant's account over multiple time periods, offering an alternative damages analysis based on market pricing and transaction history. The Bankruptcy Court's opinion expressly references my testimony in connection with the valuation issues presented in that matter, and the subsequent appeal record likewise describes my role as the claimant's expert on the value of the relevant digital assets.

9. More broadly, my work as an expert has involved applying specialized knowledge of blockchain mechanics, crypto-market structure, wallet attribution, sanctions risk, and

transaction tracing to fact patterns arising in civil litigation, enforcement matters, investigative proceedings, and insolvency-related disputes. That work requires translating technical blockchain evidence into findings that are understandable and useful to courts, counsel, investigators, and public authorities. In practice, this includes analyzing on-chain movements of funds, identifying the relationship between wallet clusters and exchanges or service providers, assessing how stablecoins and other digital assets are used to move value across borders, and evaluating the market value of digital assets at relevant points in time. These subjects fall squarely within my professional work at Inca Digital, which provides data and analytics on the digital asset ecosystem to government agencies and financial institutions.

10. Because of that background, I have been asked to provide expert opinions not merely on the existence of blockchain transactions, but on what those transactions mean in context: whether they reflect sanctions evasion, laundering typologies, fraud proceeds movement, exchange exposure, or other operational patterns relevant to legal proceedings. My testimony and expert analysis are informed by years of professional experience at the intersection of cryptocurrency, national security, intelligence operations, and financial investigations.

11. I am a published author on illicit finance and national security issues. Some of my recent publications and co-authorships include:

a. Adam Zarazinski & Bruno Faverio, *Swap Around and Find Out: The New Rules of International Digital Economic Warfare*, War on the Rocks (Aug. 15, 2025), https://warontherocks.com/2025/08/swap-around-and-find-out-the-new-rules-of-international-digital-economic-warfare/;

b. Hannah Miller & Muyao Shen, *Crypto Exchanges Are Allowing Sanctioned*

*Russian Banks Access, Report Says*, Bloomberg (Feb. 24, 2023), https://www.bloomberg.com/news/articles/2023-02-24/huobi-kucoin-are-allowing-sanctioned-russian-banks-access-report-says (discussing report from Inca Digital and interview with Adam Zarazinski detailing how Tether is used by Russians to move money out of the country and provide crypto banking services to sanctioned Russian banks);

c. Sam Sutton & Lara Seligman, *Two Major Crypto Exchanges Failed to Block Sanctioned Russians*, Politico (Feb. 24, 2023), https://www.politico.com/news/2023/02/24/two-major-crypto-exchanges-failed-to-block-sanctioned-russians-00084391 (same);

d. *Crypto Self-Policing & Accountability*, Inca Digital, https://inca.digital/intelligence/crypto-self-policing-and-accountability/ (last visited Mar. 17, 2026);

e. Tory Newmyer, *Pentagon Launches Effort to Assess Crypto's Threat to National Security*, The Wash. Post (Sept. 23, 2022), https://www.washingtonpost.com/business/2022/09/23/darpa-crypto-national-security/ ("Inca Digital CEO Adam Zarazinski said his firm's work for DARPA will be "fairly wide-ranging." Among other goals, the project aims to help the government understand how money flows in and out of blockchain systems, or public ledgers maintained on a distributed network of computers. It's also intended to distinguish real crypto trading from bot-driven activity and ferret out crypto-based scams.");

f. Aidan Ryan, *Inca digital CEO on the Wave of Crypto Hacks*, The Information,

https://www.theinformation.com/newsletters/crypto-global/inca-digital-ceo-on-the-wave-of-crypto-hacks;

g. Ben Strack, *Latest in Crypto Hiring  Social Digital Asset Platform Nabs OK Group Exec*, Blockworks (July 22, 2022), https://blockworks.co/news/latest-in-crypto-hiring-social-digital-asset-platform-nabs-ok-group-exec; and

h. Adam Zarazinski, *National Security at Stake with Biden's Crypto Executive Order*, NASDAQ (Mar. 8, 2022), https://www.nasdaq.com/articles/national-security-at-stake-with-bidens-crypto-executive-order.

## BLOCKCHAINS AND CRYPTOCURRENCY

12. A blockchain is a system for a distributed network of machines to keep a shared ledger of transactions publicly and securely. To maintain a blockchain, a distributed network of machines uses a cryptographic function called a "hash" to validate a series of transactions (a "block"), and connect the block to all the prior transactions (to create a "chain") in a way that is verifiable.

13. Cryptocurrency is a digital or virtual currency, like Bitcoin, that operates on the blockchain. It serves as a medium of exchange and a store of value.

14. Users transact in cryptocurrency on blockchain networks such as Ethereum, TRON, Binance Smart Chain, Polygon, Avalanche, and Optimism using wallet addresses. A wallet address is a unique digital identifier that represents where cryptocurrency can be sent to or received from on a blockchain. These addresses function similarly to account numbers, allowing users to transfer assets such as Bitcoin (BTC), Tether (USDT), or USD Coin (USDC) between parties on the network.

15. The value of cryptocurrency depends on the asset, how it functions, and market dynamics. Bitcoin, for example, is generally more volatile because its price fluctuates based on

market supply and demand and it is not pegged to any fiat currency. By contrast, stablecoins such as Tether (USDT) and USD Coin (USDC) are designed to maintain a relatively stable value because they are pegged, or intended to be pegged, to a reference asset such as the U.S. dollar.

16. USDT and USDC are dollar-denominated stablecoins designed to maintain a value of approximately one U.S. dollar per token. I understand that under Tether's and Circle's respective terms of service, users have a right to exchange their USDTs or USDCs for equivalent U.S. dollars (e.g., 10,000 USDTs or USDCs for $10,000). A true and correct copy of Tether's terms of service as of March 18, 2026 is attached as **Exhibit 2**. A true and correct copy of Tether's relevant information, dated February 20, 2026, is attached as **Exhibit 3**. A true and correct copy of Circle's terms of service as of March 18, 2026 is attached as **Exhibit 4**.

17. USDT and USDC are issuer-controlled stablecoins, meaning that Tether and Circle each retain administrative control over the lifecycle of their tokens. In both systems, the issuer can mint (create) new tokens when there is corresponding demand and can burn (destroy) tokens when they are redeemed or otherwise removed from circulation, thereby managing total supply. In addition, both Tether and Circle have the ability at the smart contract level to freeze or blacklist specific wallet addresses, which prevents those tokens from being transferred. If tokens are frozen, the issuer may, depending on its internal policies and applicable legal process, take further action, including leaving the assets immobilized or, in certain cases, reissuing equivalent value through new tokens. These capabilities—minting, burning, and address-level restrictions—allow the issuers to control supply and enforce compliance measures across the networks on which their tokens operate.

## EXECUTIVE SUMMARY OF OPINIONS

18. I have been asked to provide an opinion regarding: (i) Iran's use of cryptocurrency to avoid international sanctions, fund terrorism, and launder the proceeds of illicit

activity, and (ii) the basis for my conclusion that the 814 wallet holders identified in **Appendix A** are agencies or instrumentalities of Iran.

19. It is my opinion that Iranian authorities use cryptocurrency to avoid international sanctions, fund terrorism, and launder the proceeds of illicit activity and have used the 814 wallets identified in **Appendix A** for this purpose. High-ranking officials have publicly acknowledged that their strategy is to use cryptocurrency in this manner in the wake of U.S. sanctions, for example. This opinion is based on (1) public statements by Iranian officials; (2) Iran's regulatory framework for cryptocurrency; (3) my experience analyzing cryptocurrency markets and illicit-finance networks, the technical characteristics of the wallets and their transaction histories, their relationship to known Iranian crypto infrastructure, and the broader value-transfer patterns associated with Iranian state-linked actors; and (4) significant public reporting and scholarly analysis.

## OPINIONS

### I. Opinion 1: Iran Uses Cryptocurrency to Evade U.S. Sanctions and Fund Terrorism.

20. Because Iran faces significant restrictions on access to dollar-denominated banking and global payment rails—such as correspondent banking networks and SWIFT connectivity—digital assets, i.e., cryptocurrencies, provide an alternative mechanism through which value can be transmitted internationally without reliance on conventional financial intermediaries. In my professional experience analyzing digital asset markets and sanctions-related financial activity, cryptocurrency is frequently used within Iranian financial networks to facilitate cross-border settlement, to access foreign liquidity, and in many cases to support activities conducted outside the formal financial system, including operations connected to oil, sanctioned entities, and terrorism financing.

21. Iran has also invested in cryptocurrency, and particularly cryptocurrency mining,

at times formally licensing mining operations both within and outside of their borders in order to generate digital assets that can be used for trade settlement or other financial purposes.

22. Iranian officials have been explicit about their decision to use cryptocurrency to evade sanctions. They have repeatedly explained that cryptocurrency allows them to avoid banking channels and bypass U.S. sanctions.

23. Iran's Deputy for Management Development and Investment Attraction of the Vice Presidency for Science and Technology has explained that promoting cryptocurrency is a significant agenda item for the Vice Presidency for Science and Technology because digital currencies facilitate global funds transfers and assist Iran while it is under sanctions. *See* Jimmy Aki, *Iranian Official Believes Blockchain Can Drive Economic Growth*, Yahoo Fin. (Dec. 17, 2018), https://finance.yahoo.com/news/iranian-official-believes-blockchain-drive-190447672.html. A true and correct copy of an article discussing his statements is attached as **Exhibit 5.**

24. This sanctions-evasion scheme was highlighted in Iranian reporting on the opening of a large cryptocurrency mine in Rafsanjan. *See* Sanaz Mousavi, *Launching Iran's Largest Farm in Rafsanjan with Chinese Investment*, CoinIran (Dec. 12, 2019), https://tinyurl.com/3xu59f7r. At the mine opening, Mohammad Ali Deghan, the Deputy Governor for Economic Coordination of Kerman Province (in which Rafsanjan is located), explained that cryptocurrency is a path for dealing with sanctions. According to Mohammad Ali Dehgnan, the cryptocurrency "industry is a solution" to Iran's difficulties exporting its oil under sanctions. The article also discusses statements from Ahmad Anaraki Mohammadi, the Member of Parliament representing Rafsanjan in the Islamic Consultative Assembly, at the opening of the Rafsanjan mine, explaining that the use of cryptocurrency "is most efficient during times of

sanctions." A true and correct Farsi-to-English translation of this article is attached as **Exhibit 6.**

25. Similarly, a report from the Iranian Presidential Center for Strategic Studies explained that cryptocurrency is helpful to circumvent sanctions. *See* Benham Gholipour, *Official Report: Iran Could Use Cryptocurrencies to Avoid Sanctions*, IranWire (Mar. 2, 2021), https://iranwire.com/en/features/69084/. A true and correct copy of an article discussing that report is attached as **Exhibit 7**.

26. These statements from Iranian officials are consistent with warnings that I have made—cryptocurrency can be used to evade or avoid sanctions because it facilitates cross-border movement of value outside the traditional banking system and can support a range of international financial activities. To ensure cryptocurrency exchanges are not misused, Inca Digital has created tools that can be used to identify and prosecute illicit actors on exchanges and across digital asset ecosystems.

27. Using these tools, Inca Digital has been able to identify and collect data on Iranian cryptocurrency exchanges, Iranian-controlled and directed wallets, and the buying and selling of cryptocurrency in Iran. Through this financial intelligence, Inca has discovered that stablecoins—particularly dollar-pegged tokens such as USDT and USDC—play an especially prominent role in Iranian exchanges and Iranian-controlled and directed wallets. Because stablecoins, including USDT and USDC, are denominated in U.S. dollars and widely supported across global exchanges and blockchain networks, they allow Iran to direct the movement of U.S. dollars without exposure to the price volatility associated with other cryptocurrencies but with the protection that cryptocurrency offers, namely, the ability to quickly move billions in assets at an institutional level to, for example, pay Hezbollah (an Iran-backed Shiite militia) and arrange and fund oil deals.

## II. <u>Opinion 2: The Iranian Government Actively Regulates and Closely Monitors Domestic Use of Cryptocurrency.</u>

28. Iranian authorities have imposed restrictions and controls over digital asset usage and access to exchanges, reflecting the state's desire to monitor and regulate flows of value outside the rial-denominated financial system. For example, Iranian authorities have limited cryptocurrency use to specific purposes such as imports and trade settlement, while restricting its use for general domestic payments; required exchanges to implement know-your-customer ("KYC") procedures and report user activity to authorities; periodically blocked access to foreign cryptocurrency exchanges and websites to keep activity within domestically observable platforms; and directed local exchanges to comply with centralized controls—such as suspending certain trading pairs or adjusting operations—in response to monetary or capital-control concerns.

29. In fact, Iran restricts digital asset holdings by private citizens. The Central Bank of Iran has imposed limits on the amount of foreign currency that individuals may hold outside of the banking system, stating that the maximum annual purchase of stablecoins for each individual or entity is $5,000, and permitting users to hold only up to $10,000 worth of stablecoins in their balance. *See* Jubin Katiraie, *New Restrictions Imposed on the Cryptocurrency Market in Iran*, Iran Focus (Sept. 25, 2025), https://iranfocus.com/economy/55535-new-restrictions-imposed-on-the-cryptocurrency-market-in-iran/; *Iran Caps Stablecoin Purchases and Holdings as Rial Hits Record Low*, Iran Int'l (Sept. 27, 2025), https://www.iranintl.com/en/202509270149 (reporting that Asghar Abolhasani, secretary of the Central Bank's High Counsel stated, users "will have only a brief period to comply"). True and correct copies of these articles are attached as **Exhibits 8 and 9.**

30. In another example, during periods of acute currency instability, such as in 2018

following the reimposition of U.S. sanctions, Iranian authorities imposed strict foreign exchange controls, including ordering individuals and businesses to sell foreign currency holdings through the official banking system at government-set rates and criminalizing unauthorized possession or trading of foreign currency outside those channels. Enforcement actions during that period included arrests of currency traders, raids on exchange houses, and confiscation of foreign currency held outside the regulated system, demonstrating the government's willingness to intervene directly in private holdings of foreign-denominated assets when they are perceived to contribute to capital flight or exchange rate pressure.

31. In the context of cryptocurrency mining, Iran has taken analogous steps to assert control, including requiring licensed cryptocurrency miners to register with authorities and sell their mined digital assets, primarily Bitcoin, through channels designated by the Central Bank of Iran for use in financing imports. In practice, this policy allows the government to capture domestically generated cryptocurrency and redirect it into state-controlled trade settlement mechanisms, effectively converting privately mined digital assets into a government-managed source of foreign value for sanctioned import activity.

32. These actions demonstrate the Iranian government's ability to directly intervene in cryptocurrency markets and restrict access to dollar-denominated value, consistent with its broader pattern of controlling high-value financial assets during periods of economic or geopolitical stress and reflect the Iranian government's significant authority over foreign currency holdings, under which the government may seize or regulate amounts exceeding the $5,000 and $10,000 thresholds.

## III. Opinion 3: Iran Has Developed a Cryptocurrency Ecosystem to Support its Use of Cryptocurrency, including Stablecoins, to Evade Sanctions, Fund Terrorism, and Launder the Proceeds of Illicit Activity.

33. Iran has developed a significant domestic cryptocurrency ecosystem to support its

use of cryptocurrency. Estimates demonstrate that the Islamic Revolutionary Guard Corps controls a significant portion of Iran's cryptocurrency exchanges. *See* Elizabeth Howcroft & Tommy Reggiori Wilkes, *Iran's Surging Crypto Activity Draws US Scrutiny*, Reuters (Feb. 3, 2026), https://www.reuters.com/business/finance/irans-surging-crypto-activity-draws-us-scrutiny-2026-02-03/ ("Chainanalysis estimates that 50% of Iran's volumes last year were linked to the Islamic Revolutionary Guard Corps (IRGC), a powerful political, military and economic force with close ties to Supreme Leader Ayatollah Ali Khamenei."). A true and correct copy of this article is attached as **Exhibit 10**.

34. Key components of this ecosystem include domestic cryptocurrency exchanges, which provide trading, custody, and account infrastructure for users; over-the-counter ("OTC") trading desks and brokers, which facilitate large bilateral transactions outside public order books and enable the conversion of Iranian rial into digital assets and vice versa; payment intermediaries, which coordinate the movement of funds between domestic platforms and international markets; liquidity providers and market makers, which supply trading liquidity and allow large transactions to be executed without significant price impact; mining operations, which generate cryptocurrency and introduce newly created assets into circulation; and technical infrastructure providers, including cloud hosting and telecommunications that support exchange and transaction activity.

35. Inca Digital conducted a multi-stage intelligence and analytics process to identify Iranian exchanges and related financial infrastructure. This work was performed by a team of analysts and engineers with expertise in financial intelligence, open-source intelligence collection, and blockchain analytics. The analysis was conducted over a period of several months leading up to this report and assessed multiple blockchain networks and data sources.

36. The process began with a baseline intelligence mapping of the Iranian cryptocurrency ecosystem, in which Inca Digital identified domestic exchanges (i.e., exchanges only available in Iran), OTC trading desks, and related service providers operating within Iran or primarily serving Iranian users. This initial mapping relied on open-source intelligence, platform identification, domain analysis, and review of exchange interfaces and services available to users.

37. Following this identification phase, Inca Digital conducted market-structure and transaction analysis of Iranian exchange activity, examining how these entities interact with one another and with international cryptocurrency exchanges and liquidity venues. This included analyzing trading behavior, identifying liquidity pathways, and mapping how funds move between Iranian platforms and the broader global digital asset ecosystem. This step allowed Inca Digital to identify key infrastructure nodes, including exchanges and intermediary actors that facilitate cross-border value transfer.

38. Through this analysis, Inca Digital identified more than six million blockchain addresses attributable to fifteen major Iranian cryptocurrency exchanges where holders transact using USDT, USDC, and other cryptocurrencies, including:

a. AbanTether.com

b. Bit24.cash

c. Bitpin.ir

d. Coinifa.com

e. EFEX.pro

f. Exonyx.org

g. Mazdax.ir

h. OK-EX.io

i. Rabex.ir

j. RabinCash.com

k. Ramzinex.com

l. Sarrafex.com

m. TetherLand.com

n. Wallex.ir

o. Nobitex.ir

39. These exchanges operate in a manner that demonstrates meaningful integration with and control by the Iranian government and its financial authorities. In particular, the operational behavior of these exchanges indicates that they function within a regulatory and supervisory framework dominated by the Central Bank of Iran and other state authorities. Public reporting, corporate affiliations, and infrastructure analysis indicate that several exchanges operate within networks that have ties to state-linked telecommunications, technology, or security entities. I address Iran's control over the exchanges in turn.

a. **Bit24.cash.** Bit24.cash functions in part as an OTC trading desk, facilitating large cryptocurrency transactions outside traditional exchange order books. In 2024, a reported data breach involving approximately 230,000 user accounts indicated that the platform collected extensive KYC information from its users. Reporting associated with that incident suggested that such information may be accessible to or shared with FATA, Iran's Cyber Police, which operates under the Law Enforcement Command of the Islamic Republic of Iran. Requirements that exchanges maintain detailed user identification information accessible to law

enforcement authorities are consistent with regulatory oversight and supervision by the Iranian state.

b. **Bitpin.** Bitpin's underlying corporate infrastructure has been linked to Arya Hamrah Samaneh, a technology and telecommunications contractor that provides services associated with communications infrastructure in Iran. The existence of such relationships suggests that certain cryptocurrency exchanges operate within a broader technology ecosystem that overlaps with companies performing work for the Iranian government.

c. **Nobitex.** Translated internal Nobitex documentation confirms the Nobitex exchange utilizes physical (bare-metal) servers located entirely within Iran and operated by state-linked data providers: Shatel, ArvanCloud, and Fanap. ArvanCloud has been sanctioned by both the United States and the United Kingdom for their contributions to the Iranian government's ongoing efforts to censor or otherwise control access to the Iranian internet. A true and correct copy of an internal Inca Digital document analyzing ArvanCloud's infrastructure is attached as **Exhibit 11.** Fanap was established via a partnership with Pasargad Bank, which the Iranian government established as part of its efforts to privatize Iran's banking system.

d. **Nobitex Code Repository.** Nobitex's internal code repository contains a corporate_banking subfolder that reveals direct integrations with TomanPay and Jibit, financial data providers based in Tehran. Jibit publicly advertises itself as "one of the largest official payment partners of [Central Bank]." TomanPay, which provides services for 17 banks (including four entirely state-owned banks),

has publicly stated its commitment to providing services "in interaction with the Central Bank and other relevant institutions." Nobitex specifically categorizes their integration with TomanPay as corporate_banking, providing an inroad from the Iranian government's traditional finance holdings into cryptocurrency and the blockchain.

e. **Ramzinex**. Public information concerning Ramzinex indicates that individuals associated with the exchange have participated in conferences and forums discussing issues such as economic security, sanctions resilience, and digital sovereignty within Iran. In addition, Ramzinex utilizes infrastructure associated with Sotoon Cloud, a technology provider operating within Iran's domestic cloud infrastructure environment. A detailed technical analysis of Sotoon Cloud and its infrastructure relationships is attached as **Exhibit 11.**

f. **Wallex**. Wallex has corporate and governance connections to individuals associated with the Fanap Group, a technology conglomerate involved in banking and financial infrastructure within Iran. Fanap and affiliated entities have participated in projects related to payment systems, financial technology platforms, and other technology infrastructure used by Iranian financial institutions.

40. Further evidence shows direct control by Iran over these exchanges. On or about February 28, 2026, the Central Bank of Iran reportedly directed major domestic cryptocurrency exchanges—including Nobitex, Wallex, Bitpin, and Tabdeal—to suspend trading in the USDT-toman trading pair. A true and correct copy of Farsi-to-English translations of announcements from the exchanges regarding the shutdown is attached as **Exhibit 12.** This trading pair

represents one of the principal mechanisms through which Iranian users convert local currency into dollar-denominated stablecoins. The exchanges complied with the Bank's order and the market effectively halted the primary channel through which rial-denominated funds could be converted into dollar-linked digital assets.

41. In my opinion, the near-simultaneous implementation of this suspension across multiple independent exchanges suggests centralized direction or regulatory command rather than independent commercial decision-making by each platform. Because these exchanges complied in a coordinated manner with the reported directive, this demonstrates the degree to which Iranian cryptocurrency exchanges operate under the influence, supervision, or control of the Iranian state and its monetary authorities.

42. Taken together, these exchanges and the government control over them reflects that Iran has worked to create a mature and relatively sophisticated digital asset ecosystem that allows both state-linked actors and private individuals in Iran to access cryptocurrency markets and move value internationally despite restrictions imposed by international sanctions.

## IV. <u>**Opinion 4: The 814 Wallets Identified in Appendix A Are Controlled By the Agencies or Instrumentalities of Iran.**</u>

43. In parallel to the above investigation, *supra* ¶¶ 35-37, Inca Digital performed systematic collection of wallet addresses directly from exchange infrastructure. This included scraping and recording cryptocurrency addresses that Iranian exchanges publicly expose through deposit interfaces, payment gateways, API endpoints, and transaction pages. These addresses were cataloged and attributed to specific exchanges, e.g., Wallex, Nobitex, or EFEX, based on their context, labeling, and repeated use in exchange-related transactions.

44. Using these collected addresses as a dataset, Inca Digital then conducted

blockchain forensic analysis across multiple networks,[1] including Ethereum, TRON, Binance Smart Chain, Polygon, Avalanche, and Optimism. This analysis involved transaction tracing, and graph-based analysis to identify additional wallets associated with the exchanges.

45. Through this process, Inca Digital identified (i) wallets that are part of exchange-controlled infrastructure and (ii) wallets that transact directly with those exchanges within one hop.[2] Inca Digital then validated the resulting address sets through iterative analysis, including reviewing transaction patterns, testing clustering assumptions, and confirming consistency across multiple data sources and blockchain networks, allowing Inca Digital to develop a high-confidence dataset of wallets associated with Iranian exchanges and their immediate counterparties (identified in **Appendix A**), which forms the basis for the analysis presented in this report.

46. It is important to note that cryptocurrency use in Iran is not limited to government-linked actors. Ordinary Iranian citizens face substantial economic hardship, persistent inflation, currency depreciation, and restrictions on access to global financial services. As a result, many private individuals also use digital assets as a store of value and as a mechanism to send or receive money internationally, particularly when traditional remittance channels are unavailable or unreliable. In this respect, cryptocurrency functions in Iran both as a sanctions-evasion and illicit finance tool within certain state-linked financial networks and as a consumer financial instrument used by private citizens seeking to preserve savings or access international markets.

---

[1] A crypto network is a decentralized, blockchain-based digital system that secures transactions via cryptography, operating without central authorities. These peer-to-peer networks use distributed ledgers to record data across multiple computers, ensuring high security, immutability, and transparency. Common examples include Bitcoin and Ethereum.

[2] A "hop" is a downstream transaction, akin to a subsequent bank transfer to another account.

47. For this reason, I have eliminated over $3.3 billion in digital asset balances and more than 7.9 million addresses associated with Iranian cryptocurrency exchanges from my analysis as it is possible these balances belong to private parties not controlled by Iran.

48. Specifically, through additional filtering and refinement—focusing on proximity to exchange infrastructure, transaction behavior, and asset composition— my team at Inca Digital and I narrowed the dataset to 814 wallets holding approximately $500 million in USDT and USDC stablecoins (**Appendix A**), which, in my opinion, are wallets operated by, on behalf of, or for the benefit of agencies or instrumentalities of the Iranian government.

49. The 814 wallets identified in our analysis are directly connected to the Iranian cryptocurrency ecosystem described above. Based on blockchain transaction analysis conducted by Inca Digital, these wallets fall into two closely related categories.

50. A portion of the wallets belong to or are controlled by the Iranian exchanges themselves. These include addresses that form part of the exchange's operational infrastructure—such as deposit wallets, hot wallets, treasury wallets, liquidity management wallets, and settlement wallets—which are used to custody funds, process deposits and withdrawals, and facilitate trading activity. These wallets are typically generated and managed through the exchange's internal wallet management systems and can be identified through transaction behavior and repeated interaction with other known exchange-controlled addresses.

51. Exchange wallets function as centralized custody infrastructure that aggregates and manages assets on behalf of many users. When a user purchases cryptocurrency on an exchange, the asset is typically credited to an account associated with that user but held within the exchange's custodial wallet system. These wallets are custodial in nature, meaning the exchange controls the private keys and maintains internal records attributing balances to

individual users rather than assigning each user a unique on-chain wallet.

52. As a result, exchange wallets often reflect a high volume of transactions, including numerous inbound deposits and outbound withdrawals over time, as users continuously move assets into and out of the platform. Many of these wallets are "hot" wallets—connected to the internet—to facilitate real-time trading and withdrawals. While this enables liquidity and operational efficiency, it also introduces security considerations, and exchanges typically manage this risk through internal controls, including the use of cold storage and wallet segregation, rather than relying on individual users to immediately withdraw their assets.

53. The exchange wallets identified in **Appendix A** follow a different pattern. Analysis by Inca Digital demonstrates that those wallets send out large sums of stablecoin to the remaining, "hop" wallets, *see infra* ¶ 54. But under regulations and controls established by the Central Bank of Iran, civilians (and exchanges) cannot use external cryptocurrency, like stablecoin, to make such large sum transfers. Indeed, as demonstrated by a true and correct copy of a Farsi to English translation of those regulations, attached as **Exhibit 13**, private citizens are "prevent[ed] [from] us[ing] cryptocurrencies as a means of payment within the country." Only the government, and its counterparts, like the IRGC, may do so, *id.*, demonstrating the large sum transfers to the "hop" wallets identified in **Appendix A** are controlled by the Iranian Government and for its benefit. This demonstrates that the exchange wallets are being directed by the Iranian Government to facilitate large asset transfers into the "hop" wallets that also function for the government.

54. The remaining wallets are direct counterparties to those exchange-controlled wallets, meaning they transact within a single blockchain "hop" of the exchange infrastructure. Inca Digital has traced these wallets, *infra* ¶¶ 61-64, using an analytics tool that can

automatically track the "hop" transactions. In practical terms, these wallets function as off-exchange operational wallets that hold funds immediately adjacent to the exchange. Based on their transaction patterns and proximity to exchange infrastructure, these wallets are consistent with addresses used by large account holders, treasury operators, or institutional actors that maintain balances just outside the exchange while still interacting directly with it.

55. The asset composition, proximity to fifteen exchanges identified above, and transaction behavior demonstrate that the 814 wallets are agencies and instrumentalities of Iran.

56. **Asset Composition.** Each of the 814 wallet holders possess more than $10,000 in stablecoin assets. To ensure innocent, private citizens are not included in the identified wallets, I adopted a $50,000 threshold. That is, only those addresses holding a stablecoin balance greater than $50,000, which is more than five times the $10,000 benchmark referenced above, are included. By applying this filter, the analysis excludes wallet-holders consistent with ordinary retail activity and instead focuses on wallets whose balances materially exceed levels that could be held by private Iranian citizens.

57. Not only do the 814 wallet-holders possess more than $50,000, they possess *thousands,* sometimes *hundreds of thousands* beyond this threshold. For example, address 0x00e84a0b678cd4584a9a377d334c810025970873 holds $210,848.38 in USDT and USDC; address 0x18779e0200a1a716e785cfe2c6f52bb763242cab holds $108,782.16 USDC; address 0xd2687ebffd715ee8f23971745979b558a78f5ea0 holds $56,483.97 in USDT; address 0x168470c67f1b6d6e89d0c7cb51c1adc6b5c6cc8a holds $1,244,719.99 in USDT and USDC; and 0xd5c1c8b411b26628db9063a732f61f64dbe55038 holds $2,235,019.09 in USDC. Other examples of high holdings abound—on average nearly 60% of the wallet holders hold more than $100,000.

58. The presence of substantial balances in these wallets strongly indicates that the assets are associated with institutional actors operating within the Iranian financial ecosystem rather than with private users. Under Iranian law and regulatory practice, funds exceeding the permitted foreign currency limits would either constitute property of the Iranian government or funds in which the government retains a direct or indirect interest, including the ability to seize, regulate, or control those assets. Simply put, the Iranian government would not sanction these high holdings unless the wallet belonged to state-affiliated entities, agencies, or instrumentalities of the Iranian government, which operate outside the limitations imposed on ordinary citizens.

59. **Proximity to Exchanges.** Each of the 814 wallets identified either transact on the fifteen exchanges identified above, *supra* ¶ 38, that are closely monitored and regulated by the Iranian government, or receive funds directly from these exchanges. As demonstrated in **Appendix A**, large sums of USDT and USDC flow through the exchanges—indeed, some transactions surpass the million-dollar mark. There is simply no way the government would permit such large transactions unless it was directing, controlling, or benefiting from it.

60. **Transaction Behavior.** Inca Digital focused much of its analysis on the TRON network. The TRON network is particularly relevant because TRON is a public blockchain designed for high-throughput, low-cost transactions and has become a primary network for USDT activity. Launched in 2017, TRON has evolved into a widely used infrastructure for transferring dollar-denominated value, in large part due to its very low transaction fees, fast settlement times, and ease of wallet creation. In my experience analyzing blockchain data, these characteristics have led to its widespread adoption by exchanges, OTC desks, and cross-border payment networks, particularly in jurisdictions where access to traditional banking infrastructure is limited. A significant portion of global USDT circulation occurs on TRON, and the network is

broadly supported across exchanges and liquidity providers, making it an efficient settlement rail for moving value internationally.

61. These same characteristics also contribute to TRON's use in higher-risk financial activity. In practice, segments of the TRON ecosystem—particularly certain OTC markets and exchanges serving sanctions-constrained jurisdictions—can present lower transactional friction, allowing users to move large amounts of value quickly and at low cost. As a result, TRON is frequently used in contexts where speed, liquidity, and minimal transaction costs are prioritized, including cross-border transfers involving jurisdictions with limited access to the traditional financial system.

62. In the address sets reviewed here, transaction volume on TRON materially exceeded point-in-time wallet balances, indicating that end-of-period balances alone understate the scale of value moving through the relevant wallets. For example, one TRON address, TGvANnmux6fTkyCApZK8QuwcMv7bBqvtBd, which appears at row 346 of **Appendix A**, received approximately $2 million in USDT on January 24, 2025 between 09:46:09 (UTC) and 10:04:30 (UTC) and then distributed those funds to multiple downstream wallets in transfers ranging from approximately $150,000 to $688,000. In another instance, a separate TRON address, TTXQtvDzGRNaFaueoQRkyy628g8nX1TiCA, which appears at row 646 of **Appendix A**, received approximately $11 million in USDT during the relevant period and then transferred those funds onward to a subsequent wallet in the transaction chain. This type of activity is consistent with money laundering techniques and indicative of illicit financial flows. The use of TRON in these transactions is consistent with its role as a widely used infrastructure layer for stablecoin-based transfers, and the observed activity indicates that the wallet holders in this analysis actively utilize TRON as part of their transaction and settlement operations.

63. Notably, these transactions exceed the $5,000 stablecoin acquisition permitted under Iranian law, further evidence that these wallets are exempt from regulatory rules as they operate for or on behalf of Iran.

64. In my opinion, patterns of this kind—large-value receipts followed by rapid onward transfers through related wallets—are more consistent with illicit financial flows, treasury, settlement, or other high scale operational functions than with ordinary personal-use activity. TRON's relevance to this analysis is also consistent with broader market evidence showing that USDT activity on TRON is substantial and that the network plays a major role in stablecoin transfer volume.

65. **Internet Usage During Shutdown.** Iran maintains centralized control over its internet infrastructure, with the majority of domestic and international traffic routed through state-controlled telecommunications systems and a limited number of government-controlled gateway points. Internet service providers operate under government licensing requirements and are obligated to implement monitoring and filtering controls, enabling authorities to oversee and restrict online activity at scale. This centralized architecture allows the government not only to filter and surveil internet traffic but also to impose targeted restrictions or, when necessary, shut down access to the global internet entirely. In addition, Iran has developed a domestic network, often referred to as the National Information Network, which enables internal digital services to continue functioning even when access to the broader global internet is limited or disrupted, further reinforcing state control over digital infrastructure.

66. Notably, 426 of the 814 wallet holders had stablecoin transactions while the internet was shut down in Iran. *See* Steven Feldstein & Shreya Joshi, *Iran's Internet Shutdown Tells a Larger Story: Digital Repression Is on the Rise*, Bull. of the Atomic Scientists (Jan. 22,

2026), https://thebulletin.org/2026/01/irans-internet-shutdown-tells-a-larger-story-digital-repression-is-on-the-rise/; Amanda Meng *et al.*, *Iran's Latest Internet Blackout Extends to Phones and Starlink*, Ga. Tech. (Jan. 16, 2026), https://www.gatech.edu/news/2026/01/16/irans-latest-internet-blackout-extends-phones-and-starlink. True and correct copies of these articles are attached as **Exhibits 14 and 15.** Private citizens did not have access to the internet during this time, meaning the transactions would have had to be authorized by and at the direction of the Iranian government. This provides more evidence that the wallet-holders—who each engaged in an average of 241.354 transactions during this time—are agencies or instrumentalities of Iran.

67. Because cryptocurrency exchanges act as one of the central gateways through which funds enter and exit the Iranian digital asset ecosystem, both categories of wallets—(a) exchange-controlled operational wallets and (b) their immediate one-hop counterparties holding funds directly adjacent to the exchange—form part of the financial architecture through which the agencies and instrumentalities of the Iranian government store, transfer, and settle value within that ecosystem. These relationships, when considered together with the fact that the balances observed in these wallets exceed the $10,000 threshold discussed above, are consistent with entities operating as agencies or instrumentalities within the Iranian financial system rather than ordinary retail cryptocurrency users.

## V. Opinion 5: There Is Substantial Risk that the Identified Assets May Be Moved.

68. There is a substantial risk that, if Iranian authorities or affiliated entities become aware of enforcement or seizure efforts involving the assets identified in **Appendix A**, they may attempt to rapidly move or dissipate the funds through the cryptocurrency ecosystem. Digital assets can be transferred across borders almost instantaneously and through multiple intermediary wallets, exchanges, or cross-chain mechanisms, which can significantly complicate asset recovery once movement begins. Sanctioned actors frequently use such techniques—

including layered wallet transfers (i.e., multiple, downstream transfers with intermediary accounts, wallets, or exchanges), intermediary brokers, and cross-jurisdictional exchanges—to obscure ownership and evade sanctions enforcement. Accordingly, from an operational standpoint, there is a meaningful possibility that assets connected to this ecosystem could be transferred to new wallets, exchanges, or jurisdictions if advance notice of legal action becomes known.

## CONCLUSION

69. Based on the available data, it is my opinion that the wallets identified in this analysis are associated with entities operating on behalf of, or within the financial infrastructure of, the Iranian government. This conclusion is informed by several converging factors. First, Iranian regulations governing foreign-currency holdings—such as the Central Bank of Iran's rule limiting individuals to approximately $10,000 in foreign currency outside the banking system—reflect a broader framework in which access to foreign-currency-denominated value is tightly controlled. Second, the blockchain tracing described above reveals transaction volumes and flows through these wallets that substantially exceed levels typically associated with ordinary retail users and instead reflect institutional-scale movement of stablecoins and other digital assets through exchange-linked infrastructure. Third, Iranian cryptocurrency exchanges themselves operate within a regulatory environment in which the government of Iran exercises significant oversight, including the ability to impose coordinated directives affecting trading activity across multiple platforms. Finally, both Inca Digital intelligence and public reporting have documented the use of cryptocurrency infrastructure by Iranian state-linked actors as a means of facilitating international financial activity despite sanctions-related restrictions. Taken together, the scale of the transaction activity, the regulatory context governing foreign-currency access, the direct connections between the wallets and Iranian exchange infrastructure, and the degree of

centralized oversight exercised by Iranian authorities support the conclusion that the wallets identified in this analysis are most consistent with entities operating within, or in support of, the Iranian state's financial ecosystem.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.



Executed on: March 19, 2026
New York, New York

Adam Zarazinski