UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

FREDERICK C. BENSON, et al.,

Plaintiffs,

v.

ISLAMIC REPUBLIC OF IRAN and JOHN DOE WALLET HOLDERS 1-814,

Defendants,

v.

TETHER INTERNATIONAL, S.A. DE C.V. and CIRCLE INTERNET FINANCIAL LLC.

Garnishees.

No. 26-cv-2327

**EMERGENCY MOTION FOR *EX PARTE* ORDER OF ATTACHMENT**

# TABLE OF CONTENTS


INTRODUCTION ....... 1

FACTUAL BACKGROUND ....... 3

I. Plaintiffs & Their Judgments Against Iran ....... 3

II. Blockchains and Cryptocurrency ....... 3

III. Iran Uses Cryptocurrency to Evade U.S. Sanctions and Fund Terrorism. ....... 6

IV. The 814 Wallets Are Controlled By Agencies or Instrumentalities of Iran. ....... 10

ARGUMENT ....... 15

I. An Order of Attachment is Warranted Under CPLR §§ 6201, 6205, and 6211. ....... 16

A. Plaintiffs Have a Cause of Action. ....... 17

B. It Is Probable Plaintiffs Will Succeed on the Merits of Their Claims. ....... 18

1. It Is Probable the Wallet Holders Are Agencies or Instrumentalities of Iran. ....... 18

2. It Is Probable that the Stablecoins Are Blocked Assets of Iran. ....... 20

C. Two Independent Grounds for Attachment Exist. ....... 22

D. There Are No Counterclaims. ....... 22

E. Any Undertaking Should Be Set at the Statutory Minimum of $500. ....... 23

II. Ex Parte Attachment Is Appropriate. ....... 23

III. The Court Should Provide Direction and Clarification to the Marshal by Ordering Service of the Order of Attachment on Garnishee Tether "in the Same Manner as a Summons" under New York Law. ....... 25

IV. The Court Should Direct Service Under CPLR 6211(b). ....... 27

CONCLUSION ....... 29

CERTIFICATE OF COMPLIANCE ....... 29

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*ABKCO Indus., Inc. v. Apple Films, Inc.*,
39 N.Y.2d 670 (1st Dep't 1976) ....................22

*AlDohan v. Kouyoumjian*,
451 N.Y.S.2d 367 (Sup. Ct. 1982), *rev'd on other grounds*, 461 N.Y.S.2d 2 (1983) ....................27

*All. Bond Fund, Inc. v. Grupo Mexicano de Desarrollo, S.A.*,
190 F.3d 16 (2d Cir. 1999) ....................22

*Bank of Leumi Tr. Co. of N.Y. v. Istim, Inc.*,
892 F. Supp. 478 (S.D.N.Y. 1995) ....................17

*Bernstein v. Bernstein*,
No. 2024–11422, 2026 WL 681576 (N.Y. App. Div. 2d Dep't Mar. 11, 2026) ....................23

*BSH Hausgerate, GmbH v. Kamhi*,
282 F. Supp. 3d 668 (S.D.N.Y. 2017) ....................23

*Cadlerock Joint Venture, L.P. v. Simms*,
245 A.D.3d 41 (N.Y. App. Div. 2d Dep't 2025) ....................17

*In re Celsius Network LLC*,
666 B.R. 28 (S.D.N.Y. 2024) ....................28

*Doe v. JPMorgan Chase Bank, N.A.*,
899 F.3d 152 (2d Cir. 2018) ....................22

*EM Ltd. v. Republic of Argentina*,
389 F. App'x 38 (2d Cir. 2010) ....................22

*Est. of Botvin by Ellis v. Heideman, Nudelman & Kalik, P.C.*,
115 F.4th 594 (D.C. Cir. 2024) ....................23

*Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*,
592 U.S. 351 (2021) ....................26

*Havlish v. Taliban*,
152 F.4th 339 (2d Cir. 2025) ....................16, 17, 18

*Herzi v. Ateliers De La Haute-Garonne*,
2015 WL 8479676 (S.D.N.Y. Oct. 13, 2015) ....................24

*Hotel 71 Mezz Lender LLC v. Falor*,
14 N.Y.3d 303 (2010) ....................24, 25

*JDF Realty, Inc. v. Kim*,
2010 WL 231624 (N.Y. Sup. Ct. Jan. 6, 2010)....................17

*Khachikian v. Casey*,
2026 WL 63633 (S.D. Cal. Jan. 8, 2026)....................29

*Kim v. North Korea*,
No. 25-mc-527, ECF No. 13-1....................25

*Kirschenbaum v. 650 Fifth Ave. & Related Props.*,
830 F.3d 107 (2d Cir. 2016).................... *passim*

*Kirschenbaum v. 650 Fifth Ave.*,
257 F. Supp. 3d 463 (S.D.N.Y. 2017)....................19

*LCX Ag v. 1.274M U.S. Dollar Coin*,
2022 WL 3585277 (N.Y. Sup. Aug. 21, 2021)....................28

*Levin v. Bank of N.Y. Mellon*,
2013 WL 5312502 (S.D.N.Y. Sept. 23, 2013)....................20

*Levinson v. Kuwait Fin. House (Malaysia) Berhad*,
44 F.4th 91 (2d Cir. 2022) ....................15, 18, 22

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
732 F.3d 161 (2d Cir. 2013)....................26

*Morgenthau v. Avion Res. Ltd.*,
49 A.D.3d 50 (1st Dep't 2007) ....................24

*People v. Unknown Parties*,
87 Misc. 3d 950 (N.Y. Sup. Ct. 2025) ....................28

*Peterson v. Bank Markazi*,
121 F.4th 983 (2d Cir. 2024) ....................18, 26

*Rubin v. Islamic Republic of Iran*,
583 U.S. 202 (2018)....................20

*Stansell v. Revolutionary Armed Forces of Columbia*,
771 F.3d 713 (11th Cir. 2014) ....................19

*TAGC Mgmt., LLC v. Lehman*,
842 F. Supp. 2d 575 (S.D.N.Y. 2012)....................22

*Thornapple Assocs., Inc. v. Sahagen*,
2007 WL 747861 (S.D.N.Y. Mar. 12, 2007) ....................................................................24

*United States v. 4,340,000 Tether ("USDT") Cryptocurrency*,
No. 25-cv-386, Dkt. No. 1 (N.D. Ohio Apr. 25, 2025)....................................................6

*United States v. Approx. 1,694,395 Tether Cryptocurrency*,
No. 24-cv-2828 (D.D.C. 2025) ........................................................................................6

*Yong Xiong He v. China New Star Rest., Inc.*,
2020 WL 6202423 (E.D.N.Y. Oct. 22, 2020).........................................................23, 25

**Statutes**

28 U.S.C. § 1603..................................................................................................................16

28 U.S.C. § 1608....................................................................................................................3

28 U.S.C. § 1610..................................................................................................15, 16, 17

28 U.S.C. § 1963..................................................................................................................17

CPLR § 302...........................................................................................................................26

CPLR § 308...........................................................................................................................28

CPLR § 5240.........................................................................................................................25

CPLR § 5406.........................................................................................................................17

CPLR § 6201................................................................................................................ *passim*

CPLR § 6205.......................................................................................................15, 16, 17, 23

CPLR § 6210.........................................................................................................................25

CPLR § 6211................................................................................................................ *passim*

CPLR § 6214....................................................................................................................25, 27

N.Y. Bus. Corp. Law § 307 ..............................................................................................25, 27

N.Y. Est. Powers & Trusts Law § 13-A-1 .............................................................................22

TRIA § 201(a)............................................................................................................. *passim*

**Other Authorities**

31 C.F.R. § 560.211 ...............................................................................................................6

31 C.F.R. § 594.201 ....................6

*Cash Fast*, BITPAY, https://www.bitpay.com/sell-tether (last visited Mar. 19, 2026) ....................5

David D. Siegel & Patrick M. Connors, *Siegel's New York Practice* § 316 (6th ed. 2024) ....................16

David D. Siegel, *Siegel's New York Practice* § 491 ....................24, 25

Elizabeth Howcroft & Tommy Reggiori Wilkes, *Iran's Surging Crypto Activity Draws US Scrutiny*, REUTERS (Feb. 3, 2026) ....................8

Exec. Order No. 13,599 ....................6, 20, 21

Fed. R. Civ. P. 4 ....................28

Fed. R. Civ. P. 64 ....................15, 17

Fed. R. Civ. P. 65 ....................25

Fed. R. Civ. P. 69 ....................2, 15, 17

*Iran's Financial Sector*, CHAINALYSIS (Jan. 30, 2026), https://www.chainalysis.com/blog/ofac-designates-iranian-crypto-exchanges-january-2026/ ....................8

Marcus George, *Iran Pledges to Counter "Malicious" Oil Embargo*, REUTERS (July 1, 2012) ....................7

Sara Bazoobandi, *Populism, Jihad, and Economic Resistance: Studying the Political Discourse of Iran's Supreme Leader* ....................7

*U.S. Sanctions Won't Change Iran Policies Says FM*, RADIO FARDA (Dec. 15, 2018), https://tinyurl.com/5dayuvrx ....................7

U.S. Dep't of State https://travel.state.gov/content/travel/en/consularnotification/ConsularNotificationandAccess/IranIslamicRepublicof.html (last visited Mar. 21, 2026) ....................29

U.S. Dep't of State, https://www.state.gov/reports/country-reports-on-terrorism-2020/iran (last visited Mar. 11, 2026)....................3

## INTRODUCTION

Through this motion, Plaintiffs seek an emergency order of attachment against an estimated $500 million in cryptocurrency assets held by agencies or instrumentalities of the Islamic Republic of Iran ("Iran"). Plaintiffs seek this relief under seal, *ex parte*, and on an emergency basis because of the substantial risk that if this action is publicized, or the requested relief delayed, Iran and its agents will dissipate the target assets and move them beyond the reach of any U.S. court. Given the highly mobile nature of cryptocurrency assets—they can be moved across borders and through financial networks virtually instantaneously—and in light of the ongoing military conflict in Iran, the risk of dissipation is extreme. Plaintiffs therefore seek this order of attachment *ex parte*, and seek further relief authorizing alternative service and directing the Marshal to levy the order of attachment by serving the Garnishee-stablecoin issuers—Tether International S.A. de C.V. ("Tether") and Circle Internet Financial LLC ("Circle")—(the "Garnishees") promptly. Further, Plaintiffs seek an order requiring the Garnishees to "burn" and "remint" the target stablecoins immediately, so that they can be held in a separate, secure wallet pending the outcome of this litigation—a technological and practical necessity that the Garnishees frequently implement in similar situations in response to court orders.

Plaintiffs are 1,341 U.S. military servicemembers, or their surviving family members, who were victims of terrorist attacks sponsored by Iran. Plaintiffs hold money judgments against Iran entered in various actions in the U.S. District Court for the District of Columbia. Collectively, Plaintiffs' judgments total approximately $20 billion, including $10,498,664,592 in compensatory damages and prejudgment interest. In this action, Plaintiffs seek recognition and enforcement of their judgments, including attachment and execution against an estimated $500 million belonging to agencies or instrumentalities of Iran. Plaintiffs seek to execute on those assets under the Terrorism Risk Insurance Act ("TRIA"), which makes available for execution—and attachment in

aid of execution—the blocked property of agencies or instrumentalities of a terrorist party like Iran "[n]otwithstanding any other provision of law," pursuant to the attachment and execution procedures of Articles 52 and 62 of the New York Civil Practice Law and Rules ("CPLR"). *See* Fed. R. Civ. P. 69.

Through investigation, Plaintiffs have identified 814 anonymous wallet addresses that, as alleged in the Complaint and through sworn expert testimony, are likely owned and operated by agencies and/or instrumentalities of Iran. In fact, as Plaintiffs' expert testifies in the declaration submitted with this motion, these wallets hold and process such enormous quantities of cryptocurrency in such unusual ways that, combined with other significant evidence, it is implausible that they are *not* owned and operated by agents of the Iranian regime. Indeed, the wallets currently hold approximately $500 million of U.S.-dollar-backed stablecoins, a large sum that is nonetheless a small fraction of the total amount Plaintiffs are owed on their judgments.

In this action, Plaintiffs ultimately seek a determination that the anonymous Wallet Holders are, in fact, agencies or instrumentalities of Iran such that their assets are subject to execution under section 201(a) of TRIA. An *ex parte* order of attachment is essential to preserve those assets so that they may eventually be applied to satisfaction of Plaintiffs' judgments. As further set forth in this motion, and in the supporting papers, the Garnishees with possession of the target assets—Tether and Circle—possess both the legal and practical ability to secure the target stablecoins through a process called "burning" and "reminting". Essentially, the Garnishees will cancel the stablecoins held by the Wallet Holders' addresses, and reissue them to a secure wallet that can be maintained safely during the pendency of this litigation, either to return any assets belonging to a defendant who successfully contests Plaintiffs' TRIA action, or to be turned over to Plaintiffs when final judgment is entered.

## FACTUAL BACKGROUND

### I. Plaintiffs & Their Judgments Against Iran

Iran has facilitated and engaged in terrorist acts for decades, using the Islamic Revolutionary Guard Corps-Qods ("IRGC") force, among others, to support terrorist organizations and create instability.[1] Each of the 1,341 individual plaintiffs in this case have had their lives inalterably damaged by Iran's terrorist acts. *See* Compl. ¶¶ 30-38, 50-51, 58-60.

In various actions filed in the U.S. District Court for the District of Columbia, Plaintiffs sued Iran for sponsoring terrorist attacks, including the ones described above. Iran never appeared, requiring Plaintiffs to prove their claims "by evidence satisfactory to the court" under the Foreign Sovereign Immunities Act ("FSIA"). 28 U.S.C. § 1608(e). The respective district courts undertook extensive fact-finding and found Iran responsible for each attack, entering judgments against Iran totaling over $20 billion in damages, including $10,498,664,592 in compensatory damages. Compl. ¶¶ 58-60.

### II. Blockchains and Cryptocurrency

In recent years, Iran has turned to cryptocurrency, purchased through the blockchain, to evade sanctions, finance its oil-industry, and fund terrorism. A blockchain operates through machines that validate a series of transactions to create a verifiable "chain." Second Declaration of Adam Zarazinski ¶ 12 ("Zarazinski Decl."). Users transact in cryptocurrency on blockchain networks, like Ethereum, TRON, and Binance Smart Chain, and on exchanges using wallet addresses. *Id.* ¶ 14. A wallet address is a unique digital identifier that functions like an account number, allowing users to transfer stablecoins like Tether ("USDT") and USD Coin ("USDC"), or

[1] *See* Country Reports on Terrorism 2020: Iran, U.S. Dep't of State, https://www.state.gov/reports/country-reports-on-terrorism-2020/iran (last visited Mar. 11, 2026) (explaining use of the IRGC to commit and support terrorist acts).

other cryptocurrency assets like Bitcoin ("BTC"), between parties on the network. *Id*.

The value of cryptocurrency depends on the asset. Unlike non-pegged coins, such as BTC, which are not tied to any specific currency, stablecoins like USDT and USDC are pegged to the U.S. dollar—one USDT and one USDC respectively equal one U.S. dollar.[2] *Id.* ¶ 16. Thus, to acquire USDT (Image 1) or USDC (Image 2), a user completes a U.S. dollar wire deposit, and receives the corresponding amount of USDT or USDC.[3] *Id.*

**Image 1**




[2] *See also What are Tether Tokens and How Do They Work?*, TETHER, https://tether.to/ru/how-it-works/ (last visited Mar. 19, 2026) ("All Tether tokens are pegged at 1-to-1 with a matching fiat currency (e.g., 1 USDT = 1 USD) and are backed 100% by Tether's reserves."); *What Is USDC?*, CIRCLE, https://developers.circle.com/stablecoins/what-is-usdc ("USDC is backed 100% by highly liquid cash and cash-equivalent assets so that it's always redeemable 1:1 for USD.").

[3] *See also How to Acquire Tether Tokens*, TETHER, https://tether.to/en/how-to-acquire-tether-tokens/ (last visited Mar. 19, 2026); *Tokenizing and Redeeming USDC*, CIRCLE, https://help.circle.com/s/article/Tokenizing-and-redeeming-USDC?language=en_US&category=Transactions (last visited Mar. 19, 2026).

**Image 2**

# Tokenizing and redeeming USDC

Tokenization is the process by which a real-world asset, such as USD, is made available as a crypto-native token. There are three steps to tokenizing USD into USDC:

1. A user sends USD to an issuer's bank account

2. The issuer sends a request to the USDC smart contract to mint an equivalent amount of USDC

3. The issuer makes the newly minted USDC available to the user while holding the USD they were sent in reserve

USDT and USDC stablecoins are backed 100% by U.S. dollar assets. That means, at any point, a user can redeem their USDT or USDC stablecoins for equivalent U.S. dollars (e.g., 10,000 USDTs or USDCs for $10,000).[4] *Id.* ¶ 17. This right to redeem is expressly stated in both Circle's and Tether's respective terms of service.[5] *Id.* ¶ 16; *see also* Exs. 2-4 (describing the right to redeem). To make this exchange possible, Tether keeps reserves on hand, as does Circle (for USDC).[6] *See id.* ¶ 16; Exs. 2-6. The majority of these treasuries are U.S. treasuries, which Tether holds in New York at Cantor Fitzgerald, a New York based financial services firm, and which Circle holds at The Bank of New York Mellon, another New York based financial services firm.[7] *See id.* ¶ 16; Exs. 5-10.

USDT and USDC are issuer-controlled stablecoins, meaning both Tether and Circle retain

[4] *See Sell Tether (USDT): Convert USDT to Cash Fast*, BitPay, https://www.bitpay.com/sell-tether (last visited Mar. 19, 2026); *USDC*, Circle, https://www.circle.com/usdc (last visited Mar. 19, 2026).

[5] *See* Zarasinki Decl., Ex. 2 at § 4.1 (Tether's Terms of Service) (explaining redemption process and that it is "a contractual right personal to [the user]"); *Id.*, Ex. 3 at § 2, (Circle's USDC Terms) ("Circle … commits to redeem 1 USDC for 1 USD….").

[6] *See* Zarazinski Decl., Ex. 2 ("Each Tether Token in circulation is 100% backed by an amount of assets ('Reserves') equal to the stated value of the Tether Token. Tether Tokens are denominated in a specific Fiat currency. For example, if you purchase 100 USDT, Reserves valued at US$100.00 back those Tether Tokens."); *Id.*, Ex. 3 ("Each USDC is intended to maintain a value of 1 USD. In order to issue 1 USDC, a corresponding 1 USD (or an equivalent amount of USD-denominated assets) is held in the USDC Reserves.").

[7] *See* Zarazinski Decl., Ex. 5 (Tether holds 83.1% in U.S. treasury bills); *Id.*, Ex. 6 (Circle reserves contain short-dated U.S. treasuries, overnight US Treasury repurcahse agreements, and cash).

administrative control over the lifecycle of their tokens (i.e., stablecoins). *Id.* ¶ 17. In both systems, Tether and Circle can respectively mint (create) new tokens when there is corresponding demand and can burn (destroy) tokens when they are redeemed or otherwise removed from circulation. *Id.* This right to control is expressly stated in Tether's and Circle's respective terms of service, giving both the ability to also freeze or blacklist specific wallet addresses to prevent tokens from being transferred for legal violations.[8] *Id.*, Exs. 2-4. Indeed, Tether states it "may also seize and destroy Tether Tokens remotely, in response to demands from government, law enforcement or other authorities," as does Circle.[9] *Id.* ¶ 17. If tokens are frozen, Tether and Circle can burn and remint the stablecoins into a secure wallet pending resolution of the investigation or litigation at issue. *Id.*; *see also e.g.*, *United States v. 4,340,000 Tether ("USDT") Cryptocurrency*, No. 25-cv-386, Dkt. No. 1 at 3 (N.D. Ohio Apr. 25, 2025) ("[P]ursuant to a federal seizure warrant … Tether Limited "burned" the USDT tokens … [and] reissued the equivalent amount of USDT tokens … to a U.S. law enforcement-controlled virtual currency wallet."); *United States v. Approx. 1,694,395 Tether Cryptocurrency*, No. 24-cv-2828 (D.D.C. 2025) (same).

## III. Iran Uses Cryptocurrency to Evade U.S. Sanctions and Fund Terrorism.

For decades, Iran has faced comprehensive U.S. sanctions aimed at combatting its capacity and willingness to sponsor terrorist operations. *See, e.g.*, Exec. Order No. 13599, 77 Fed. Reg. 6659, 6659 (Feb. 5, 2012) (blocking assets in which Iran or its agencies and instrumentalities have an interest); *see also* 31 C.F.R. § 560.211 (Iran Transactions and Sanctions Regulations implementing the executive order); *id.* § 594.201(a)(5) (Global Terrorism Sanctions Regulations blocking assets of "officials, agents, or affiliates of Iran's Islamic Revolutionary Guard Corps"). For just as long, Iran has sought to evade these sanctions. In 2011, for example, Ayatollah Ali

[8] *See also FAQs—Why Are Tether Tokens Burned?*, TETHER, https://tether.to/en/faqs/ (last visited Mar. 13, 2026).
[9] *See* Zarazinski Decl., Exs 2, 11-12.

Hosseini Khamenei, the supreme leader of Iran from 1989 to 2026, directed the Iranian nation to mobilize against international sanctions.[10] The next year, Iranian oil minister Rostam Qasemi asserted that "[a]ll possible options have been planned in government to counter sanctions."[11] And after facing renewed sanctions in 2018, Iranian foreign minister Mohammad Javad Zarif boasted that "[i]f there is an art we have perfected in Iran … it is the art of evading sanctions."[12]

To support this sanctions evasion, Iran has turned to cryptocurrency, which provides an alternative mechanism through which value can be transmitted internationally without reliance on conventional financial intermediaries. Zarazinski Decl. ¶ 20 ("[C]ryptocurrency is frequently used [by Iran] … to support … operations connected to oil, sanctioned entities, and terrorism financing."). Iranian officials have been express about this use. *See id.* ¶¶ 22-25; *see also id.* ¶33 (describing IRGC's use of Iran's cryptocurrency market to facilitate sanctioned asset transfers). As part of this sanctions-evading strategy, the Iranian government strictly regulates the cryptocurrency market, imposing limits on private citizens use of the market, *id.* ¶ 53 (private citizens prevented from using cryptocurrencies as a means of payment), and on the purchase of foreign cryptocurrency, like stablecoins, *id.* ¶ 29 (under Iranian law, individuals and entities may purchase $5,000 maximum annually and hold only up to $10,000 in stablecoins).

Because of limits on Iran's ability to use traditional international banking tools, the Iranian regime has developed a significant domestic cryptocurrency ecosystem to support its use of cryptocurrency, and specifically stablecoins, which provides several operational advantages for Iran: stablecoins are typically denominated in U.S. dollars, are widely supported across global

---

[10] Sara Bazoobandi, *Populism, Jihad, and Economic Resistance: Studying the Political Discourse of Iran's Supreme Leader*, 32 DIG. MIDDLE E. STUD., 321, 325-26 (2023).
[11] Marcus George, *Iran Pledges to Counter "Malicious" Oil Embargo*, REUTERS (July 1, 2012), https://tinyurl.com/2ck224v6.
[12] AFP, *U.S. Sanctions Won't Change Iran Policies Says FM*, RADIO FARDA (Dec. 15, 2018), https://tinyurl.com/5dayuvrx.

exchanges and blockchain networks, and allow Iranian wallets (i.e., wallets of Iran or wallets controlled by Iran) to move value without exposure to price volatility. *Id.* ¶ 27.

Expert analysis shows that Iran operates through fifteen major cryptocurrency exchanges only available inside the country:AbanTether.com, Bit24.cash, Bitpin.ir, Coinifa.com, EFEX.pro, Exonyx.org, Mazdax.ir, OK-EX.io, Rabez.ir, RabinCash.com, Ramzinex.com, Sarrafex.com, TetherLand.com, Wallex.ir, and Nobitex.ir. *Id.* ¶ 38. Notably, exchanges like the fifteen identified have already been connected to sanctions evasion by the Iranian regime.[13] Indeed, just recently, the Office of Foreign Assets Control ("OFAC") designated two UK-registered cryptocurrency exchanges, run by Iranian businessmen, for operating in Iran's financial sector and processing cryptocurrency transactions for the IRGC.[14]

The fifteen identified exchanges operate in a manner that demonstrates meaningful integration with and control by the Iranian government and its financial authorities. *Id.* ¶ 39. In particular, the operational behavior of these exchanges indicates that they function within a regulatory and supervisory framework dominated by the Central Bank of Iran and other state authorities. *Id.* Specifically,

- **Bit24.cash:** In 2024, a reported data breach suggested that Bit24.cash shares Know Your Customer information with FATA, Iran's Cyber Police, which operates under the Law Enforcement Command of the Islamic Republic of Iran. *Id.* ¶ 39(a).
- **Bitpin:** Bitpin's underlying corporate infrastructure has been linked to Arya Hamrah

[13] Elizabeth Howcroft & Tommy Reggiori Wilkes, *Iran's Surging Crypto Activity Draws US Scrutiny*, REUTERS (Feb. 3, 2026), https://www.reuters.com/business/finance/irans-surging-crypto-activity-draws-us-scrutiny-2026-02-03/ ("Chainalysis estimates that 50% of Iran's volumes last year were linked to the Islamic Revolutionary Guard Corps (IRGC), a powerful political, military and economic force with close ties to Supreme Leader Ayatollah Ali Khamenei.").
[14] *See OFAC Designates Iranian-Linked Crypto Exchanges in First-Ever Action Targeting Digital Asset Firms in Iran's Financial Sector*, CHAINALYSIS (Jan. 30, 2026), https://www.chainalysis.com/blog/ofac-designates-iranian-crypto-exchanges-january-2026/.

Samaneh, a technology and telecommunications contractor that provides services associated with communications infrastructure in Iran. *Id.* ¶ 39(b).

- **Nobitex:** Translated internal Nobitex documentation confirms the exchange utilizes physical (bare-metal) servers located entirely within Iran and operated by state-linked data provider ArvanCloud, among others. ArvanCloud has been sanctioned by both the United States and the United Kingdom for contributing to the Iranian government's ongoing efforts to censor or otherwise control access to the Iranian internet. *Id.* ¶ 39(c). Further, Nobitex's internal code repository reveals direct integrations with TomanPay and Jibit, financial data providers that partner with the Central Bank of Iran. Nobitex specifically categorizes their integration with TomanPay as providing an inroad from the Iranian government's traditional finance holdings into cryptocurrency and the blockchain. *Id.* ¶ 39(d); Ex. 22.
- **Ramzinex:** Ramzinex utilizes infrastructure associated with Sotoon Cloud, a technology provider operating within Iran's domestic cloud infrastructure environment. *Id.* ¶ 39(e); Ex. 22.
- **Wallex:** Wallex has corporate and governance connections to individuals associated with the Fanap Group, a technology conglomerate involved in banking and financial infrastructure within Iran. Fanap and affiliated entities have participated in projects related to payment systems, financial technology platforms, and other technology infrastructure used by Iranian financial institutions that are controlled by the Iranian government. *Id.* ¶ 39(f).

The existence of such relationships demonstrates the fifteen exchanges operate under the Iranian government's surveillance and control. *Id.* ¶ 39. Further evidence supports the same

conclusion: On or about February 28, 2026, the Central Bank of Iran reportedly directed major domestic cryptocurrency exchanges—including Nobitex, Wallex, Bitpin, and Tabdeal—to suspend trading in the USDT-toman trading pair. *Id.* ¶ 40. The exchanges complied and the market halted, clearly demonstrating the exchanges operate under the influence, supervision, or control of the Iranian state and its monetary authorities. *Id.* ¶ 41; Ex. 23 (Farsi-to-English translations of announcements regarding shutdown).

Taken together, these exchanges and the government control over them reflects that Iran has worked to create a mature and sophisticated digital asset ecosystem that allows it easy access to cryptocurrency markets and the ability to move large assets internationally to, *inter alia*, fund terroristic activities abroad and evade sanctions, while largely excluding everyday Iranian citizens from accessing and participating in the market on equivalent terms. *Id.* ¶¶ 29, 42.

## IV. The 814 Wallets Are Controlled By Agencies or Instrumentalities of Iran.

As part of its investigation into the fifteen identified exchanges, Inca Digital, Inc. ("Inca Digital") located 814 wallets directly connected to the Iranian cryptocurrency ecosystem that operate as agencies and/or instrumentalities of Iran. *Id.* ¶¶ 44, 48. These wallets, identified in Appendix A of the Second Declaration of Adam Zarazinski ("Appendix A"), are either (i) part of the exchange-controlled infrastructure ("exchange wallets") or (ii) transact directly with those exchanges and with the exchange wallets within one or two transaction hops ("hop wallets").[15] *Id.* ¶ 45. Importantly, these 814 wallets were specifically monitored and selected based on their transaction patterns and holdings—as part of the analysis, over $3.3 billion in digital asset balances and more than 7.9 million addresses were eliminated, including 6 million wallets that hold under $10,000, given that these wallets could belong to innocent actors. *Id.* ¶¶ 46-48.

[15] A hop is a downstream transaction, akin to a subsequent bank transfer to another account.

**The 9 Exchange Wallets.** Exchange wallets are part of an exchange's operational infrastructure and function as centralized custody infrastructure that aggregates and manages assets on behalf of many users. When a user purchases cryptocurrency on an exchange, the asset is typically credited to an account associated with that user but held within the exchange's custodial wallet system. *Id.* ¶ 51. As a result, exchange wallets often reflect a high volume of transactions, including numerous inbound deposits and outbound withdrawals over time, as users continuously move assets into and out of the platform. *Id.* ¶ 52.

Given the limitations on stablecoin purchases and holdings, Iranian exchange wallets should follow a pattern of disbursing small asset sums to Iranian crypto-users. But the exchange wallets identified in Appendix A (rows 26, 43, 57, 102, 158, 501, 570, 589, and 713) follow a different pattern. These wallets send out large disbursements of stablecoins, i.e., hundreds of thousands to millions in USDT and USDC, to downstream wallets, including the 805 non-exchange (or "hop") wallets identified in Appendix A. But under regulations and controls established by the Central Bank of Iran, civilians (and exchanges) cannot use external cryptocurrency, like stablecoin, to make such large sum transfers. *Id.* ¶ 53 (citizens are "prevent[ed] [from] us[ing] cryptocurrencies as a means of payment within the country"). These large-asset transfers—made by exchanges that are actively monitored by the Iranian government—violate Iranian law, which is strictly enforced, *id.* ¶ 30, providing clear evidence that the exchange wallets are only operating outside the legal parameters because they are disbursing funds to Iranian agents, *not* ordinary citizens, *id.* ¶ 53. Said differently, only the government and its counterparts, like the IRGC, would be able to make such large sum transfers, *id.*, demonstrating the large sum transfers to the hop wallets identified in Appendix A are controlled by the Iranian Government and for its benefit.

**The 805 Hop Wallets.** The 805 hop wallets identified in Appendix A are direct counterparties to transactions with the exchange wallets, meaning they transact within a blockchain "hop" of the exchange wallets and the exchange infrastructure. *Id.* ¶ 54. Inca Digital has traced these wallets, *id.* ¶¶ 54, 61-64, and seen that, like the exchange wallets, the hop wallets have received hundreds of thousands to millions in USDT and USDC, held such large sums, and sent such large sums downstream to other wallets. These rapid, downstream transfers of large assets, coupled with the large holdings and proximity to exchange infrastructure, indicates the wallets are not being used by ordinary citizens but instead are being used by the Iranian government or its agents to facilitate transfers for the regime's purposes, including evading sanctions. *Id.* ¶¶ 54, 64.

More granularly, the asset composition, proximity to the fifteen-identified exchanges, and transaction behavior demonstrate that the 814 wallets are agencies and instrumentalities of Iran.

- **Asset Composition.** Each of the 814 Wallet Holders possess more than $50,000 in stablecoin assets—more than five times the allowable limit for ordinary citizens. *Id.* ¶¶ 29, 57. Not only that, they possess *thousands* sometimes *hundreds of thousands* beyond this threshold. For example, address 0x00e84a0b678cd4584a9a377d334c810025970873 holds $210,848.38 in USDT and USDC stablecoins; address 0x18779e0200a1a716e785cfe2c6f52bb763242cab holds $108,782.16 USDC stablecoin; address 0x168470c67f1b6d6e89d0c7cb51c1adc6b5c6cc8a holds $1,244,719.99 in USDT and USDC stablecoins; and address 0xd5c1c8b411b26628db9063a732f61f64dbe55038 holds $2,235,019.09 in USDC stablecoin. Other examples of high holdings abound. *See, e.g.*, App'x A at Rows 124, 128, 163, 343. The presence of substantial balances in these wallets strongly indicates that these wallets operate on the Iranian government's behalf and hold assets belonging to the government, as the Iranian government would not sanction

these high stablecoin holdings unless the Wallet Holders were state-affiliated entities, agencies, or instrumentalities of the Iranian government, and therefore entitled to operate outside the limitations imposed on ordinary citizens. *Id.* ¶ 58; *see also id.* ¶ 30 (detailing enforcement by Iran of its foreign exchange controls, which included "arrests of currency traders, raids on exchange houses, and confiscation of foreign currency held outside the regulated system").

- **Proximity to Exchanges.** Each of the 814 Wallet Holders transact on the fifteen identified exchanges, which are closely monitored and regulated by the Iranian government. As demonstrated in Appendix A, 805 wallets hold large sums of USDT and USDC stablecoins just off the exchanges, so that the stablecoin can easily be sent through the exchanges. *Id.* ¶¶ 48, 54. Said differently, the one-hop proximity allows Iranian agents to quickly receive large sums of money, like $11 million in USDT, *id.* ¶ 62, and then disperse that money onward to other Iranian actors, while simultaneously maintaining proximity to the exchange to quickly send assets through the exchange to other networks, *id.* ¶ 54. There is simply no way the government would permit such large holdings or transactions, particularly so close to the exchanges it monitors, unless it was directing, controlling, or benefiting from it. *Id.* ¶¶ 40, 59.
- **Transaction Behavior.** The Wallet Holders regularly directed multiple downstream wallet transfers, indicating their use by Iranian agents or instrumentalities. *Id.* ¶ 48, 64. For example, one wallet, TGvANnmux6fTkyCApZK8QuwcMv7bBqvtBd, which appears at row 346 of Appendix A, received approximately $2 million in USDT on January 24, 2025 between 09:46:09 (UTC) and 10:04:30 (UTC) and then immediately distributed those funds to multiple downstream wallets in transfers ranging from approximately $150,000 to

$688,000. *Id.* ¶ 62. In another instance, wallet TTXQtvDzGRNaFaueoQRkyy628g8nX1TiCA, which appears at row 646 of Appendix A, received approximately $11 million in USDT and then transferred those funds onward to a subsequent wallet. *Id.*; *see also id.* ¶ 63 (forbidding transfers over the $5,000 threshold). These rapid, downstream transactions, which occurred on TRON—a network frequently used for cross-border transfers involving jurisdictions with limited access to the traditional financial system, like Iran—are consistent with intermediary, treasury, settlement, or other operational functions to pay multiple actors downstream than with ordinary personal-use activity. *Id.* ¶¶ 61, 64; *see also* Ex. 20 (OFAC sanctioned Iranian actor, who was operating on the TRON blockchain to send tens-of-millions in USDT stablecoin).

- **Internet Usage During Shutdown.** Iran maintains centralized control over its Internet infrastructure, with the majority of domestic and international traffic routed through state-controlled telecommunications systems and a limited number of government-controlled gateway points. *Id.* ¶ 65. This allows the government not only to filter and surveil Internet traffic but also to impose targeted restrictions or, when necessary, shut down access to the global internet entirely and cryptocurrency markets as a result. *Id.* Despite the Internet being shut down in January 2026, 426 of the Wallet Holders were able to transact stablecoin during the shutdown, further demonstrating that the Wallet Holders are not ordinary private citizens that are bound by the rules but are agencies or instrumentalities that operate for Iran. *Id.* ¶ 66.

The fifteen identified exchanges act as one of the central gateways through which funds enter and exit the Iranian digital asset ecosystem. The exchange and hop wallets are used to facilitate these transfers, providing a means of getting money into and out of the exchanges to

make the cross-jurisdictional transfers needed to fund oil deals and terrorist activities. The transactions between the exchanges and wallets, particularly at such high values, are consistent with wallets being a part of the sanctions-evading ecosystem, providing clear evidence that the wallets operate as agencies or instrumentalities within the Iranian financial system rather than ordinary retail cryptocurrency users. *Id.* ¶ 67.

**ARGUMENT**

TRIA authorizes attachment and execution of "the blocked assets of any agency or instrumentality of [a] terrorist party" to "satisfy a judgment for which there was original jurisdiction under the FSIA if certain statutory elements are satisfied." TRIA § 201(a), codified at note following 28 U.S.C. § 1610; *see Kirschenbaum v. 650 Fifth Ave. & Related Props.*, 830 F.3d 107, 131 (2d Cir. 2016) ("*Kirschenbaum I*"), *abrogated on other grounds by Rubin v. Islamic Republic of Iran*, 583 U.S. 202 (2018). Plaintiffs hold such judgments against Iran[16] and, based on Plaintiffs' evidentiary submissions at this stage, it is probable that the Wallet Holders are agencies or instrumentalities of Iran, and that the USDT and USDC they hold at the 814 addresses listed in Appendix A are blocked by virtue of their status as U.S.-sited property owned by agents or instrumentalities of the government of Iran. Plaintiffs accordingly have a cause of action to execute against—and obtain attachment in aid of execution against—those assets under TRIA.

The procedure for enforcing judgments under TRIA is dictated by the law "of the state where the court is located," Fed. R. Civ. P. 64(a), 69(a); *see Levinson v. Kuwait Fin. House (Malaysia) Berhad*, 44 F.4th 91, 97 (2d Cir. 2022). Here, CPLR § 6205 permits a court to issue "[a]n order of attachment … in aid of execution to a party that has been awarded a money judgment against a foreign state … in accordance with and subject to the limitations of 28 United States

[16] *See* Nathan Decl. Ex 1 (listing Plaintiffs' judgments under the FSIA terrorism exception)

Code Section 1610 and other applicable law." CPLR § 6212(a) sets forth the showing needed to warrant attachment: Plaintiffs must "show, by affidavit and such other written evidence as may be submitted, [1] that there is a cause of action, [2] that it is probable that the plaintiff will succeed on the merits, [3] that one or more grounds for attachment provided in [CPLR] 6201 exist, and [4] that the amount demanded from the defendant exceeds all counterclaims known to the plaintiff." And CPLR § 6211(a) authorizes *ex parte* orders of attachment such as the one requested here.

Plaintiffs satisfy all of the CPLR's prerequisites to obtaining an order of attachment in aid of execution against the assets sought here. Plaintiffs request that this Court enter such an order and, in order to effectuate that order, require Garnishees to "burn" and "remint" the USDT and USDC stablecoins identified in Appendix A into a secure wallet controlled by Plaintiffs or the Marshal, so that the Wallet Holders are not able to dissipate the assets and move them beyond the reach of U.S. courts.

## I. An Order of Attachment is Warranted Under CPLR §§ 6201, 6205, and 6211.

CPLR § 6205 permits attachment "after a judgment has been awarded" in cases "involving a judgment against a foreign sovereign." David D. Siegel & Patrick M. Connors, *Siegel's New York Practice* § 316 (6th ed. 2024). Plaintiffs have "money judgment[s] against a foreign state, as defined in 28 United States Code Section 1603," Declaration of Aaron E. Nathan ("Nathan Decl."), Ex. 1, and attachment is therefore authorized "subject to the limitations of 28 United States Code Section 1610 and other applicable law." CPLR § 6205.

No such limitations preclude attachment. TRIA "supersede[s]" "the FSIA's execution immunity provisions," including those codified at 28 U.S.C. § 1610, *Havlish v. Taliban*, 152 F.4th 339, 359 (2d Cir. 2025), and expressly permits "attachment in aid of execution" where, as here,

the underlying judgments are based on an act of terrorism, *id.* at 358-59 (quoting TRIA § 201(a)).[17]

Plaintiffs also meet the remaining attachment requirements. Consistent with CPLR § 6212(a), (1) Plaintiffs have a cause of action; (2) "it is probable that [they] will succeed on the merits" of their claims for execution and turnover of the stablecoins; (3) "one or more grounds for attachment provided in section 6201 exist"; and (4) there are no known counterclaims. *See JDF Realty, Inc. v. Kim*, 2010 WL 231624 (N.Y. Sup. Ct. Jan. 6, 2010).

### A. Plaintiffs Have a Cause of Action.

The first two elements—a cause of action and probability of success—are easily satisfied. "As to the first and second requirements, *i.e.*, that a claim for a money judgment exists and that the movant is likely to succeed on the merits, the court must give the plaintiff the benefit of all the legitimate inferences that can be drawn from the facts." *Bank of Leumi Tr. Co. of N.Y. v. Istim, Inc.*, 892 F. Supp. 478, 482 (S.D.N.Y. 1995) (internal quotations and citations omitted).

As an initial matter, Plaintiffs have a cause of action to recognize their underlying judgments, which are entitled to full faith and credit. *See* CPLR § 5406. "In seeking recognition and enforcement of an out-of-state judgment entitled to full faith and credit, the judgment creditor does not seek any new relief against the judgment debtor, but instead merely asks the court to perform its ministerial function of recognizing the [out-of-state] money judgment and converting it into a New York judgment." *Cadlerock Joint Venture, L.P. v. Simms*, 245 A.D.3d 41, 46 (N.Y. App. Div. 2d Dep't 2025) (quotations and citations omitted).[18] Plaintiffs, who hold valid

[17] TRIA supersedes any requirement of compliance with 28 U.S.C. § 1610's notice provisions notwithstanding CPLR 6205's reference to Section 1610 because CPLR 6205 also incorporates "other applicable law," which includes TRIA. Further, although the procedure for attachment and execution is supplied by New York law, "a federal statute governs to the extent it applies." Fed. R. Civ. P. 64, 69. Even if it applied, section 1610(c)'s notice requirement would be satisfied with respect to the vast majority of Plaintiffs that have served notice of their default judgments on Iran. *See* Complaint ¶¶ 11-17 (identifying limited subset of default judgments that have not been served).

[18] Like CPLR § 5406, which preserves an action on a judgment as a mechanism for recognition and enforcement of out-of-state judgments, the federal statute authorizing registration of federal judgments, 28 U.S.C. § 1963, is available "in addition to other procedures provided by law for the enforcement of judgments."

judgments, will succeed on that cause of action against Iran.

Plaintiffs also possess a cause of action against the Doe Wallet Holders under TRIA and CPLR Article 52. Complaint ¶¶ 121-24. TRIA permits execution, and attachment in aid of execution, of judgments awarded against agencies and instrumentalities of terrorist parties. TRIA § 201(a); *Levinson*, 44 F.4th at 96. Meanwhile, CPLR Article 52 "provides [a] cause of action" for judgment creditors to seek a turnover order against a garnishee. *Peterson v. Bank Markazi*, 121 F.4th 983, 1004 (2d Cir. 2024). It is probable that Plaintiffs will succeed on those claims.

### B. It Is Probable Plaintiffs Will Succeed on the Merits of Their Claims.

#### 1. It Is Probable the Wallet Holders Are Agencies or Instrumentalities of Iran.

Under TRIA, an entity is an "agency or instrumentality" if it "(1) was a means through which a material function of the terrorist party is accomplished, (2) provided material services to, on behalf of, or in support of the terrorist party, *or* (3) was owned, controlled, or directed by the terrorist party." *Kirschenbaum I*, 830 F.3d at 135. While Plaintiffs need only show one prong, *Havlish*, 152 F.4th at 362, each one is amply satisfied here.

*First*, the Wallet Holders are the "means through which" Iran accomplishes the "material function" of sending cross-border transfers to fund terrorism, while skirting international sanctions.[19] Zarazinski Decl. ¶¶ 33-67. This is clear from the activity and holdings of the wallets. Monitoring of the 814 wallets shows that hundreds of thousands to millions in USDT and USDC has flowed through them. *Id.* ¶ 48. Further, tracing reveals a coordinated cryptocurrency ecosystem, where exchange wallets disperse large sums to hop wallets, *id.* ¶¶ 48, 53, who in turn disperse the sums in broken-up quantities downstream, *id.* ¶ 62. These types of large sum transfers

---

[19] Iranian officials have repeatedly stated that Iran uses cryptocurrency for this exact purpose—to evade sanctions and fund global transfers. *See* Zarazinksi Decl., Ex. 13.

are atypical of private actors, who are ***forbidden*** from holding or transacting such large sums, *id.* ¶ 53, 56, and are ***forbidden*** from making such large sum transfers, *id.* ¶¶ 29, 63. Understood in this way, the 814 wallets are not isolated private actors, but are part of a large, interconnected web of wallets used by the Iranian government to make large settlements and move money downstream to other Iranian agents, while evading sanctions. *Id.* ¶¶ 37, 64, 67. Indeed, that is why the wallets continued stablecoin trading during internet shutdowns, why they sit so close to the fifteen exchanges (so they can easily send and receive money), and why they operate on specific networks, like TRON, *id.* ¶¶ 61-62, 66; Ex. 20 (Iranian agent used TRON blockchain to send "thousands of transactions associated with tens-of-millions of dollars primarily in the stablecoin USDT"). Plainly, the wallets are actively being used by Iran as a front to facilitate cross-border transfers, likely connected to oil and terrorism financing, *id.* ¶¶ 20, 67, while evading sanctions. This amply satisfies this prong. *See Kirschenbaum v. 650 Fifth Ave.*, 257 F. Supp. 3d 463, 518-19 (S.D.N.Y. 2017) ("*Kirschenbaum II*") ("[M]aterial function" shown where, as here, the alleged instrumentality was used as a "front" to conceal Iran's involvement and evade sanctions).

*Second,* and relatedly, the Wallet Holders provide "material services" to, on behalf of, or in support of the Government of Iran. As established, they provide a means through which Iran can make payments to finance its government and terrorist operations, Zarazinski Decl. ¶¶ 49-67, while evading sanctions, *Id*. ¶¶ 19-26, 42, 67. *Kirschenbaum I*, 830 F.3d at 135 n.19 (defining agency or instrumentality as an entity that "provide[s] financial or technological support for or to … [the terrorist party]") (citing *Stansell v. Revolutionary Armed Forces of Columbia*, 771 F.3d 713, 724 n.6 (11th Cir. 2014)).

*Third*, the Wallet Holders are "owned, controlled, or directed by" Iran. The government of Iran closely monitors and regulates the cryptocurrency market, Zarazinski Decl. ¶¶ 28-33, 39-41,

going so far as to order citizens to cease using the foreign cryptocurrency market, *id.* ¶ 53, and setting limitations on their stablecoin holdings, *id.* ¶ 29. The 814 Wallet Holders operate free of these conditions, holding large sums of foreign stablecoins, *id.* ¶¶ 56-57, and sending and receiving foreign stablecoin disbursements that exceed the permissible limit by 20,000% (assuming a low-end transfer of a million dollars in stablecoin), ¶¶ 48, 62-63, in violation of the law, *id.* ¶¶ 29, 53, 56. Iran certainly knows about these wallets, *id.* ¶¶ 28-32, and permits them to function in violation of the law, *cf. id.* ¶ 30, because they are part of the larger cryptocurrency ecosystem that Iran has developed to evade sanctions. As part of that ecosystem, the 814 wallets are permitted to hold and send stablecoin sums that far exceed Iranian limitations ***because*** they operate for Iran's benefit and at its direction, *id.* ¶¶ 58-67. Given the transaction holdings and history of the 814 wallets, there can be no doubt that Iran tightly controls these wallets, dictating when, where, and how the cryptocurrency should be transferred to fund its terrorist regime and evade sanctions. *Id.* ¶¶ 64, 67; *see also Levin v. Bank of N.Y. Mellon*, 2013 WL 5312502, at *10-11 (S.D.N.Y. Sept. 23, 2013) (relying on expert report and expert's "common knowledge" understanding that entities were controlled by Iran).

In sum, Iran orchestrated the construction and operation of the wallets, directed the Wallet Holders' use of the wallets, and derived substantial economic benefits from the wallets, which it has used to avoid sanctions. Thus, under any prong, the Wallet Holders are agencies or instrumentalities of Iran. *Kirschenbaum I*, 830 F.3d at 135.

**2. It Is Probable that the Stablecoins Are Blocked Assets of Iran.**

Under TRIA, a "blocked asset" is "any asset seized or frozen by the United States under," among other things, "sections 202 and 203 of [IEEPA]." TRIA § 201(d)(2)(A). In 2012, President Obama issued—pursuant to IEEPA—Executive Order 13,599, blocking "[a]ll property and interests in property of the Government of Iran" that "are in the United States," later "come within

the United States," or come into "the possession or control of any United States person." Exec. Order No. 13,599. Consequently, the Second Circuit has recognized that "all assets belonging to an entity that satisfies Executive Order 13,599's definition of 'Government of Iran' are automatically blocked." *Kirschenbaum I*, 830 F.3d at 137. That definition includes both "the Government of Iran" and "any … agency, or instrumentality thereof, [including] … any person owned or controlled by, or acting for or on behalf of, the Government of Iran." *Id.* at 120 (cleaned up). Because the Wallet Holders meet the definition of agencies or instrumentalities of Iran under *TRIA*, *supra* II.B.1, it follows that they also necessarily meet the definition of a "person owned or controlled by, or acting for or on behalf of, the Government of Iran," and that any interest in property they hold with a sufficient U.S. nexus is blocked. *Kirschenbaum I*, 830 F.3d at 120.

The stablecoin are blocked assets of Iran for two further reasons. *First*, the assets are "in the United States." The Tether and Circle stablecoins held by the Wallet Holders are both backed by and tied to the U.S. dollar through assets held in New York. As stated, Tether holds its some-$187 billion at Cantor Fitzgerald, a New York-based financial institution, and Circle holds its $77.2 billion at Bank of New York Mellon, another New York-based financial institution. *See* Zarazinski Decl. ¶ 16, Exs. 5-10. These billions *are* the value of the stablecoins held by the Wallet Holders in Iran as each coin detailed in Appendix A finds its value in a dollar held in Tether's and Circle's respective New York-based reserve accounts—funds that are certainly "in the United States." It is these New York-based dollar reserves, and the Wallet Holder's rights in those New York-based dollar reserves, that Plaintiffs seek to attach—by seizing the stablecoins creating rights in those dollars—and ultimately execute on as the assets of Iran.

*Second*, each USDT and USDC stablecoin is, in reality, nothing more or less than a transferable bundle of contractual rights, including (most prominently) the right to redeem the

stablecoin for an equivalent U.S. dollar sum. New York recognizes property interests in cryptocurrency. N.Y. Est. Powers & Trusts Law § 13-A-1; *Doe v. JPMorgan Chase Bank, N.A.*, 899 F.3d 152, 156 (2d Cir. 2018) (courts applying TRIA "look to state law" to determine rights in "the property a creditor seeks to reach"). The reserves underlying the right to redeem sit in New York, which is where Cantor Fitzgerald and The Bank of New York Mellon hold the U.S. treasury and other assets underlying the stablecoins. Zarazinski Decl. ¶ 16. As such, the right to redeem the value of the stablecoins is sited in New York, *see EM Ltd. v. Republic of Argentina*, 389 F. App'x 38, 44 (2d Cir. 2010) (asset located in New York because it was held at U.S. Bank Trust, which was the "party of whom performance is required"); *ABKCO Indus., Inc. v. Apple Films, Inc.*, 39 N.Y.2d 670, (1st Dep't 1976) (license agreement sited in New York where the party required to perform resided), and can be used "for application to the judgment." *All. Bond Fund, Inc. v. Grupo Mexicano de Desarrollo, S.A.*, 190 F.3d 16, 21 (2d Cir. 1999).

**C. Two Independent Grounds for Attachment Exist.**

Two independent grounds for attachment exist under CPLR § 6201. Plaintiffs satisfy CPLR § 6201(5) because they seek to enforce "money judgment[s] against Iran" from a federal court, which are entitled to full faith and credit, *Levinson*, 44 F.4th at 98; Nathan Decl., Ex. 1. Plaintiffs also satisfy CPLR § 6201(1) because Iran "is a nondomiciliary residing without the state," it is probable that Iran "has assets within the State that could satisfy a judgment," *see supra* II.B.2, and Plaintiffs have a reasonable fear that they will not be able to satisfy their judgments without attachment, *TAGC Mgmt., LLC v. Lehman*, 842 F. Supp. 2d 575, 586 (S.D.N.Y. 2012), as Iran will quickly move the located assets before they can be attached, Zarazinski Decl. ¶ 68 (noting increased risk with cryptocurrency assets and since the war in Iran began in February 2026).

**D. There Are No Counterclaims.**

There were no counterclaims in the underlying suits against Iran, and there are none here.

Nathan Decl. ¶ 4.

**E. Any Undertaking Should Be Set at the Statutory Minimum of $500.**

While it is doubtful that an undertaking is required where attachment is issued pursuant to CPLR 6205—which does not include such a requirement—out of an abundance of caution the Court should require an undertaking of $500, the statutory minimum. When required, "[t]he amount of the undertaking must be at least $500 but otherwise is within the discretion of the court." *BSH Hausgerate, GmbH v. Kamhi*, 282 F. Supp. 3d 668, 672 (S.D.N.Y. 2017); *Bernstein v. Bernstein*, No. 2024–11422, 2026 WL 681576, at *2 (N.Y. App. Div. 2d Dep't Mar. 11, 2026) (approving $500 undertaking). The minimum undertaking is appropriate because the stablecoins will be maintained in a secure condition and able to be quickly returned to any meritorious defendants—something that is, in any event, highly unlikely in the circumstances of this case. *See Yong Xiong He v. China New Star Rest., Inc.*, 2020 WL 6202423, at *15-16 (E.D.N.Y. Oct. 22, 2020) (granting minimum $500 undertaking in light of the "nature of the properties" attached, the financial condition of the plaintiff, and the defendant's role in the harm caused to the plaintiff).

**II. *Ex Parte* Attachment Is Appropriate.**

*Ex parte* attachment is appropriate under CPLR § 6211. Iran has thousands of judgment creditors with billions of unpaid judgments and is a known recalcitrant judgment debtor. *Est. of Botvin by Ellis v. Heideman, Nudelman & Kalik, P.C.,* 115 F.4th 594, 600 (D.C. Cir. 2024). And digital assets, like stablecoins, can be transferred across borders almost instantaneously and through multiple intermediary wallets, exchanges, or cross-chain mechanisms, which can significantly complicate asset recovery once movement begins. Zarazinski Decl. ¶ 69. Sanctioned actors frequently use such techniques (as the Wallet Holders often do, *supra* III, IV). *.Id.* Accordingly, there is a significant likelihood that assets connected to this ecosystem could be transferred to new wallets, exchanges, or jurisdictions if the Defendants become aware of the

nature of these proceedings. *Id. see also* Nathan Decl. ¶ 8. These facts provide ample grounds for *ex parte* attachment under CPLR § 6211. *See Herzi v. Ateliers De La Haute-Garonne*, 2015 WL 8479676, at *3 (S.D.N.Y. Oct. 13, 2015) (granting ex parte attachment where defendant kept liquid assets and was a foreign corporation "without any apparent business operations in New York"); *Thornapple Assocs., Inc. v. Sahagen*, 2007 WL 747861, at *6 (S.D.N.Y. Mar. 12, 2007) (same, where the only asset in New York that could satisfy a judgment was "extremely liquid" and "easily transferable").

Finally, to effectuate its order, the Court should direct Garnishees to burn and remint the USDT and USDC stablecoins and put the reminted stablecoins identified in a separate and secure wallet that may be transferred to the custody of Plaintiffs, or to the Marshal, on an *ex parte* basis. This is well within the Court's jurisdiction both because the Garnishees have custody of intangible property rights sited in New York that belong to the Wallet Holders, i.e., the right to redeem, and because the Court has personal jurisdiction over the Garnishees themselves. *See Hotel 71 Mezz Lender LLC v. Falor*, 14 N.Y.3d 303, 312 (2010) ("[A] court with personal jurisdiction over a nondomiciliary present in New York has jurisdiction over that individual's tangible or intangible property, even if the situs of the property is outside New York."); *id.* at 316 ("[T]he garnishee is just another way of finding the asset's 'situs': if the garnishee has a New York presence, the debtor's asset in the garnishee's hands will usually be found to have a New York situs, too.") (quoting Siegel, New York Practice § 491 (4th Ed.)) *Morgenthau v. Avion Res. Ltd.*, 49 A.D.3d 50, 54 (1st Dep't 2007) ("[T]he New York courts have the power to command a garnishee present in the state to bring out-of-state assets under the garnishee's control into the state. Here, moreover, because the Garnishees have custody of intangible property rights belonging to the Wallet Holders, and the Garnishees are subject to the personal jurisdiction in New York, those property rights *do*

have a New York situs. *Id.* at 316 ("Finding the garnishee is just another way of finding the asset's 'situs': if the garnishee has a New York presence, the debtor's asset in the garnishee's hands will usually be found to have a New York situs, too.") (quoting Siegel, New York Practice § 491). Accordingly, the Court has power under CPLR 6210, 5240, and—if there were any doubt— under Federal Rule of Civil Procedure 65 to order that the Garnishees act immediately to preserve the target assets in a form that will prevent their dissipation. *See Yong Xiong He*, 2020 WL 6202423, at *4 n.5 (recognizing the availability, in addition to an attachment under CPLR Article 62, of "further or alternative relief in the form of a preliminary injunction pursuant to FRCP 65").

## III. The Court Should Provide Direction and Clarification to the Marshal by Ordering Service of the Order of Attachment on Garnishee Tether "in the Same Manner as a Summons" under New York Law.

Once an order of attachment is granted, and served on the Marshal, the Marshal must levy by serving the writ on the Garnishees. Because the property at issue here is not "capable of delivery," the Marshal must instead serve the order of attachment on the garnishees "in the same manner as a summons." CPLR. § 6214(a). For Circle, that requirement is straightforward as it is headquartered in New York. Compl. ¶ 25. For Tether, satisfying that requirement calls for clarification and direction from this Court, because Plaintiffs' counsel understands that the Marshal of this District has previously requested guidance from the Court prior to levying by service "in the same manner as a summons" on garnishees subject to personal jurisdiction in, but located outside of, this District. *See Kim v. North Korea*, No. 25-mc-527, ECF No. 13-1, at 12-13. Because CPLR § 6214(a) requires that the levying officer—here, the Marshal—serve the order of attachment in the "same manner as a summons," the Court should enter an order directing the Marshal to do just that. Here, because Tether (1) is not authorized to do business in New York, and (2) is subject to personal jurisdiction in this state, a summons could served on Tether by service on the Secretary of State. *See* N.Y. Bus. Corp. Law § 307(a). This Court should clarify and direct

that the Marshal must levy the order of attachment on Tether by that method of service.

*First*, Tether is not authorized to do business in New York. *See* Zarazinski Decl., Ex. 3 at 1.

*Second*, this Court may exercise specific personal jurisdiction over Tether because it has "transact[ed] business within the state," and "contract[ed] anywhere to supply goods or services in the state," and this action arises from and relates to those contacts. CPLR § 302(1). Tether has issued the very USDT stablecoins at issue with a promise that they are 100% backed by U.S.-dollar denominated reserves—reserves that Tether holds at Cantor Fitzgerald in New York. Thus, through its own purposeful conduct, Tether has availed itself of the privilege of conducting activities in New York, and this action arises from and relates to those contacts. *See Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351, 352 (2021); *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 169 (2d Cir. 2013).

The Second Circuit's decision in *Peterson v. Bank Markazi*, 121 F.4th 983 (2d Cir. 2024) is on point. There, plaintiffs sought turnover of the contents of an account held by a Luxembourg-based financial institution that held securities for the benefit of its clients. *Id.* at 990-91. One such client was the Central Bank of Iran, against which the plaintiffs held a money judgment. The *Peterson* court held twofold: (i) Article 52 provided a cause of action in favor of the plaintiffs; and (ii) the turnover action arose from defendant's New York contacts. *Id.* at 1005. For similar reasons, jurisdiction is proper here. As in *Peterson*, Plaintiffs seek to compel turnover of property reflecting a "right to payment" of money in New York. *Id.* Moreover, unlike *Peterson*, the property at issue is not located abroad; the vast majority of Tether's reserves are in New York. This Court has an even stronger basis to exercise specific personal jurisdiction over Tether here.

Accordingly, Tether may be served with a summons via service on the Secretary of State

under § 307, and therefore the Marshal "shall" serve Tether with an order of attachment in the "same manner," CPLR 6214(a). Section 307(b) in turn provides that service can be made either via personal delivery in Albany, or electronic service. N.Y. Bus. Corp. Law § 307(b). In light of the exigencies of this case, and in the interest of reducing the burden on the Marshal's office, Plaintiffs respectfully request that the Court direct the Marshal to serve Tether via electronic service on the Secretary of State. Notice similarly must be sent via registered mail, return receipt requested, to Tether at its mailing address in El Salvador, in accordance with Section 307(b). Lastly, the Marshal should be directed to begin this process within seven days of the Court's order and file proof of service pursuant to Section 307(c)(2).

## IV. The Court Should Direct Service Under CPLR 6211(b).

Article 62 requires that, after an attachment is ordered without notice, the plaintiff move for confirmation within 10 days "on such notice as the court shall direct to the defendant, the garnishee, if any, and the sheriff"—here, the Marshal. CPLR § 6211(b).[20] This "notice" is not subject to the same strictures as ordinary service of process but instead is "valid as service" under CPLR § 6211(b), as long as the Court "direct[s] service by" the method used. *AlDohan v. Kouyoumjian*, 451 N.Y.S.2d 367, 369 (Sup. Ct. 1982) (notice valid under Section 6211(b), although it did not suffice as service of summons), *rev'd on other grounds*, 461 N.Y.S.2d 2 (1983).

Accordingly, Plaintiffs respectfully request that the Court direct notice of the confirmation motion as follows.

*First*, with respect to the anonymous Doe Wallet Holders, Plaintiffs request leave to serve those anonymous defendants via a non-fungible token ("NFT") airdrop to each Doe Defendant's wallet address. Specifically, Plaintiffs propose to serve the Doe Defendants by minting and

[20] Because the attachment requested here is "on the ground specified in" CPLR 6201(1), the deadline to move for confirmation is "ten days after levy," not five. CPLR 6211(b).

transmitting an NFT to each of the identified 814 wallet addresses. Each NFT will contain the following information: (i) the name and docket number of this action; (ii) notice that the wallet holder has been named as a defendant; and (iii) a hyperlink to a website maintained by Plaintiffs where the summons, complaint, and all relevant filings may be accessed, including the confirmation motion. *See People v. Unknown Parties*, 87 Misc. 3d 950, 954 (N.Y. Sup. Ct. 2025); *In re Celsius Network LLC*, 666 B.R. 28, 31-32 (S.D.N.Y. 2024); *LCX Ag v. 1.274M U.S. Dollar Coin*, 2022 WL 3585277, at *2 (N.Y. Sup. Aug. 21, 2021). The Doe Defendants are anonymous parties identifiable only by blockchain wallet addresses, and are located in a sanctioned country with which the United States has no diplomatic relations and is currently at war. Conventional methods of service are therefore impossible or impracticable. In other circumstances that lack the additional overlay of geopolitical conflict present in this case, courts have recognized that NFT service in this manner is "reasonably calculated to give notice." *Celsius*, 666 B.R. at 36 n.6; *see id.* at 36 (observing that the "best way" for the Litigation Administrator to reach defendants was "through their crypto wallets"); *LCX*, 2022 WL 3585277, at *4 (permitting service by NFT when "using a blockchain transaction to communicate with the Doe Defendants is the only available manner of communication"). An NFT airdrop would thus satisfy the requirements for service and notice under Fed. R. Civ. P. 4(f)(3) and CPLR § 308(5), meaning that it would more than satisfy CPLR 6211(b).[21] Although the Doe Wallet Holders are anonymous, their wallet addresses are known, and this method will guarantee that *whoever* is behind those anonymous addresses will receive notice of the confirmation motion that satisfies CPLR 6211(b).

*Second*, with respect to notice to Iran, the Court should direct notice by email, mail or third-party courier (such as FedEx, UPS, DHL, or similar) to the Iran Interest Section of the Pakistan

[21] Plaintiffs will move for alternative service of the summons and complaint by a separate motion.

Embassy in Washington, D.C., which "manages the diplomatic and consular affairs of Iran in the United States." *Khachikian v. Casey*, 2026 WL 63633, at *3 n.2 (S.D. Cal. Jan. 8, 2026).[22]

*Third*, with respect to notice of the confirmation motion on the Garnishees, the Court should direct notice on Circle by serving its registered agent in New York, and on Tether by the means set forth above—in this case, with service to be carried out by Plaintiffs, rather than the Marshal. *Supra* at 27-28. In both cases, the Court should direct that Plaintiffs may provide notice to either Garnishee by email upon its written consent.

*Fourth*, and finally, with respect to notice of the confirmation motion on the Marshal, the Court should direct Plaintiffs to serve the motion by personal delivery to the Marshal, or at an email address provided by the Marshal for that purpose.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully ask that this Court grant an *ex parte* order of attachment and permit alternative service of the order as set forth in the proposed order submitted herewith.

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Local Rule 7.1(c), the undersigned certifies that the foregoing memorandum of law contains 8,486 words, as determined by the word-count function of Microsoft Word.

---

[22] *See* Iran, Foreign Consular Office Contact Information, U.S. Dep't of State https://travel.state.gov/content/travel/en/consularnotification/ConsularNotificationandAccess/IranIslamicRepublicof.html (last visited Mar. 21, 2026)

Respectfully submitted,

WILLKIE FARR & GALLAGHER LLP

March 22, 2026

By: ______________________

Aaron E. Nathan

Michael J. Gottlieb
Willkie Farr & Gallagher LLP
2029 Century Park East
Los Angeles, CA 90067
(310) 855-3000
mgottlieb@willkie.com

Nicholas Reddick (*pro hac vice* forthcoming)
Willkie Farr & Gallagher LLP
333 Bush St.
San Francisco, CA 94104
(415) 858-7400
nreddick@willkie.com

Lee S. Wolosky
Aaron E. Nathan
Willkie Farr & Gallagher LLP
787 Seventh Ave
New York, NY 10019
(212) 728-8000
lwolosky@willkie.com
anathan@willkie.com

*Counsel for Plaintiffs*